Filed 5/15/14  P. v. Griffin CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES EDWARD GRIFFIN,<br><br>    Defendant and Appellant. | A136110<br><br>(Contra Costa County<br>Super. Ct. No. 51105733) |

A jury convicted James Edward Griffin of second degree murder with personal use of a deadly weapon (a knife). (Pen. Code, §§ 187, 12022, subd. (b)(1).)[1] He is in prison serving 15 years to life for murder and an additional one year for weapon use. Defendant appeals his conviction on several grounds. He claims (1) the court wrongly admitted evidence of his connection with the Hell's Angels Motorcycle Club; (2) the court erred in using a standard jury instruction defining voluntary manslaughter; (3) the prosecutor committed misconduct during closing argument to the jury by misstating the law and referring to facts not in evidence; and (4) the court erred in discharging a deliberating juror for misrepresentations made during voir dire. We shall affirm the judgment.

**Statement of Facts**

It is undisputed that defendant killed Robert Shaner by stabbing him with a knife. Defendant claimed the killing was justified as self-defense or defense of another.

---

[1] All further section references are to the Penal Code unless otherwise noted.

1

Alternatively, defendant claimed the killing was voluntary manslaughter as imperfect self-defense or because it occurred in the heat of passion or upon a sudden quarrel.

*The Parties*

Robert Shaner was the estranged husband of Lesley Shaner, whom defendant was dating.[2] Robert and Lesley had a tumultuous five-year marriage. Robert suffered from mental illness and physically abused Lesley on multiple occasions. They separated in January 2010. Robert moved out of the couple's house to live with a friend. Lesley started dating defendant, whom she knew from childhood. Defendant had also been a friend of Lesley's brother who had recently died and who before his death had asked defendant to "take care" of Lesley. Robert told his neighbor that Lesley's brother appointed defendant as her "guardian" and protector and he did not object to defendant's relationship with Lesley. When the neighbor told Robert she had heard defendant was a Hell's Angel and "didn't care for that," Robert replied: "I don't know that he's a Hell's Angels, but he's a biker and he's a really nice guy." The two men "always talked and got along" according to Lesley.

*The Stabbing*

On March 10, 2010, Robert asked to stay overnight at the house occupied by Lesley because he had "nowhere else to go." Lesley had "concerns" about Robert staying with her given his past abusive behavior and telephoned defendant to discuss the situation. Ultimately, Lesley agreed to let Robert stay because she "felt sorry for him." Lesley slept in the bedroom and Robert stayed in the living room.

Defendant arrived at the house the following morning. Many of that morning's events are in dispute. It is undisputed, however, that Robert called his brother on defendant's cell phone around 10:00 a.m. Robert said he was at the Concord house and was leaving shortly to visit his brother in Alamo. About 30 minutes later, Robert stumbled to his next door neighbor's house beaten and stabbed.

---

[2] To avoid confusion, we shall refer to the Shaners by their first names.

The neighbor, Yasmeen Brown, testified that Robert banged loudly on her front door and, in an urgent voice, yelled out for her to call the police. Brown opened the door and found Robert "in terrible physical condition." "[H]e had blood all over the top of his head running down the side of his head, his eyes were red and swollen, he had gashes in his face, he had marks on his neck, he had a large gash . . . [to] his right hand, and he was generally beat up all over."

Brown called 911. A recording of the call was played for the jury. Brown told the 911 operator, "I have a neighbor on my porch. He is gushing blood." Robert told the operator "A Hell's Angel stabbed me." The operator asked Robert who stabbed him and Robert said James Griffin. The operator told Brown the police and medical personnel were on the way and then asked questions about the stabbing. Robert said defendant was next door and had stabbed him with a "K-bar." Brown then told the operator defendant was leaving the premises. Brown relayed the make, color and license plate number of defendant's vehicle and its direction of travel. When a police officer arrived, Brown said Robert told her "James attacked me. He went crazy on me. He hit me, beat me and knifed me." Robert was unable to talk to the officer himself and lost consciousness before the paramedics arrived. The paramedics tried to revive Robert without success.

*The Autopsy*

A forensic pathologist testified at trial that Robert died from a "stab wound to the left mid-back." The wound measured a little more than one inch on the surface and penetrated about four inches into the chest cavity from the rear. The knife entered horizontally between the sixth and seventh ribs, punctured the left lung and caused extensive internal bleeding.

Robert also suffered additional injuries. The palm of his right hand had two lacerations, which the pathologist testified was "a characteristic location of . . . a defense wound, someone trying to defend themselves from a sharp force object." One of the hand lacerations was a deep gash that "cut through some of the muscle." On cross-examination, the pathologist conceded the possibility that one could suffer hand

3

lacerations by "hastily grabbing the wrong side of the knife" during an altercation for control of the knife.

Robert had multiple bruises and abrasions on his face, neck, chest and legs and tears on his ear and lip. The lip tear was "[m]ost likely from a punch to the face." Robert's nose was bloody and "appeared to be deviated a little to the left."The pathologist said Robert suffered at least four forceful blows to the face that "would have been painful."

There were also signs of manual strangulation. There was hemorrhage in Robert's eyes and circular bruises on his neck "consistent with fingertips putting pressure on the neck." There was bleeding under the skin on each side of the neck and on the surface of the larynx, which were injuries the pathologist attributed to "compression of the neck by hands. In other words, strangulation."

*Defendant's Arrest*

The police apprehended defendant minutes after the stabbing, driving away from the house with Lesley as a passenger. The police found a blood-stained fixed blade, K-bar brand "military-type knife" in a sheath on the car's front floorboard, partially covered with a black leather vest. The sheath had a loop at the top allowing it to be worn on a belt and a snap to hold the knife in place. The sheath was unsnapped. The vest pockets contained postcards advertising Hell's Angels events and stickers with the slogans "Support your local Hell's Angels" and "Motorcycle Clubs Are Not Street Gangs." Defendant was wearing a shirt with the number 81 on it that said "Support your local red and white." A police officer testified that the shirt was affiliated with the Hell's Angels.

Defendant had "one bleeding injury" – his right elbow was slightly cut by broken dish fragments. Broken dishes were found in Lesley's kitchen that matched small fragments removed from defendant's elbow by medical personnel. A photograph taken at the time of defendant's arrest shows his face to be without injury and unmarked.

4

Defendant is six feet one inch tall and weighs 260 pounds. Robert was about five feet seven inches tall and weighed 187 pounds. Both men were in their early 40s at the time of the stabbing.

*Defendant's Police Statement*

The police interviewed defendant on the afternoon of the stabbing, beginning shortly after 4:00 p.m. and ending just before 6:00 p.m. A transcript of the interview is 66 pages. The interview was videotaped and portions of the interview were admitted in evidence and viewed by the jury. Defendant did not testify at trial.

Defendant told the police that Robert was bipolar and abusive toward Lesley but that he and Robert had never fought or argued before that day. Defendant said Lesley's dying brother asked him to "take care" of Lesley. Defendant said the brother meant that defendant "was to make sure that this guy didn't keep abusing her."

Defendant said he came to Lesley's house in the morning to help "get her stuff out of there." Defendant said Robert and Lesley started arguing so he went outside and sat in his car to wait for her. Lesley then came outside to get defendant because Robert stuck a knife in the wall. Defendant went in the house and saw a pocket knife stuck into Lesley's carousel picture hanging on the bedroom wall.[3]

Defendant gave changing accounts of the events that followed. Initially, defendant said Robert put a K-Bar knife to Lesley's throat and he fought to get the knife. The police questioned that account and told defendant it was inconsistent with Lesley's account. Defendant admitted, "I fucking lied" in "trying to save my ass." The police asked defendant "what really happened."

Defendant admitted that Robert did not put a knife to Lesley's throat and that the two men fought in the kitchen while Lesley was in the bedroom. Defendant said Robert had stabbed the picture and was "throwing shit around." Defendant wanted to "subdue" Robert and "get his attention" so he grabbed Robert and "threw him around the kitchen."

---

[3] A police officer testified that when he searched the house he saw an apparent knife-hole in the carousel picture.

Robert "attacked back" and the men "wrestled." At some point Robert hit defendant with a glass plate. Robert either grabbed defendant's knife or the knife fell out of its sheath. The men fought for control of the knife. Defendant said he gained control of the knife and Robert immediately ran out the door. Defendant said if Robert was stabbed, it happened accidentally during the fight for the knife. The police told defendant Robert was dead and defendant needed to tell the truth. Defendant denied stabbing Robert and said Robert fell on the knife.

After additional questioning, defendant admitted threatening Robert with the knife. Defendant continued to claim the men wrestled and fought over a dropped knife but now admitted gaining control of the knife and gesturing with it to make Robert back away. Defendant said he was "trying to probe" Robert by poking the knife toward him to get him to "back the fuck off." Defendant said Robert failed to move out of the way and, instead, "pivoted" or "spun." The police asked "And that's when the knife went in him?" Defendant answered, "Yeah. Maybe so far." Defendant said the knife struck Robert on the left side. Defendant insisted. "it . . . wasn't my intent to . . . stab him. My intent [was] to . . . regain control of the knife and intimidate him to get the fuck out of there." The police asked defendant if he punched Robert during the altercation and defendant said "one time," in the left eye.

When he was videotaped, defendant depicted the stabbing by holding an imaginary knife in a vertical position. Investigation revealed the stabbing wound to be horizontal. A police officer confronted defendant with this fact after the videotaped interview and defendant said he may have brought the knife around to the horizontal.

*Lesley's trial testimony*

Lesley testified about Robert's pervasive physical abuse of her and defendant's knowledge of that abuse. On one occasion, Robert held a gun to her head. Another time, he held a knife to her throat and threatened to kill her.

On the day of the stabbing, Robert became agitated, argued with her and stabbed a picture on the bedroom wall. The picture was the last birthday present she received from

her father who died when she was a child. Lesley was in the bedroom when Robert stabbed the picture and was afraid Robert was going to stab her. Lesley ran outside to get defendant. Defendant entered the house and Lesley told him Robert stabbed the picture and she was "scared for [her] life." Lesley took her small dog into the bedroom to calm it. She heard scuffling from the kitchen but did not see the altercation.

**Discussion**

1. *Evidence of the victim's belief that defendant was associated with the Hell's Angels was admissible to show the victim's state of mind during his altercation with defendant. Moreover, any error in admitting the evidence or related evidence connecting defendant with the Hell's Angels was not prejudicial.*

Defendant contends the trial court prejudicially erred when it refused to exclude evidence of his connection to the Hell's Angels. Defendant's counsel filed an in limine motion to exclude "any statements or other evidence concerning [defendant's] alleged membership or association with the Hell's Angels Motorcycle Club or that he was assigned to be Lesl[ey] Shaner's 'protector.' " The prosecution opposed the motion, arguing the evidence relevant to Robert's state of mind and thus his likely response to defendant's attack. The prosecutor also maintained "the fact that the defendant held himself out [as Lesley's] Hell's Angels protector before this incident goes to his motive and intent, for he apparently felt duty bound to eliminate Robert Shaner from Lesley Shaner's life for her future safety." The court denied the motion, finding the evidence relevant to Robert's state of mind, defendant's position as a protector, and the identification of the defendant in Robert's 911 call.

Defendant argues that evidence of his connection with the Hell's Angels was slight, of limited relevance, and should have been excluded as more prejudicial than probative. (Evid. Code, § 352.) It is true that there was little evidence connecting defendant to the Hell's Angels. The record shows only that he drove a motorcycle, wore a Hell's Angels shirt and possessed Hell's Angels stickers and event advertisements. In fact, defendant was not a member of the Hell's Angels, as the Attorney General concedes on appeal. Moreover, whatever defendant's connection to the group, there was no allegation that the stabbing was motivated by that connection. Defendant stabbed his

7

girlfriend's estranged husband during a domestic altercation, not to further the purposes of the Hell's Angels.

The Attorney General argues that evidence of defendant's connection to the Hell's Angels was relevant to prove the identity of the stabber, noting that Robert told the 911 operator he was stabbed by a Hell's Angels. But Robert also told the operator he was stabbed by James Griffin, making Robert's reference to the Hell's Angels superfluous on the issue of identity. Moreover, defendant admitted stabbing Robert. Identity was never at issue.

The Attorney General asserts that defendant was Lesley's "gang-designated 'protector,' " which explains "why he may have felt duty bound to eliminate Robert and may have acted more quickly than permissible for the protection of Lesley's safety." The record does not support that assertion. Defendant was not a "gang-designated 'protector.' " The evidence established only that Lesley's dying brother — who had no ties to the Hell's Angels — asked defendant to take care of Lesley, whom defendant had known since childhood.

Nevertheless, the Hell's Angels evidence was relevant for one of the reasons offered by the Attorney General: to prove Robert believed defendant was associated with the Hell's Angels and would have been fearful of initiating or escalating a fight with a motorcycle club associate, contrary to defendant's police account. Defendant argues that for this purpose the evidence was "only tangentially relevant" and its scant relevance was outweighed by the prejudicial impact of suggesting gang affiliation.

Gang affiliation " 'may have a highly inflammatory impact on the jury' " and thus trial courts " 'should carefully scrutinize such evidence before admitting it.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 655, quoting *People v. Williams* (1997) 16 Cal.4th 153, 193.) "[A]dmission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*Williams*, *supra,* at p. 193.)

However, our review of a trial court's evidentiary rulings are deferential. "On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is

8

relevant, not unduly prejudicial, and thus admissible." (*People v. McKinnon, supra,* 52 Cal.4th at p. 655.) We cannot say the trial court abused its discretion in admitting evidence of defendant's connection to the Hell's Angels. Robert apparently believed defendant was a member of Hell's Angels and that belief was at the forefront of his mind when he reported the stabbing to the 911 operator. Defendant's claim of self-defense put at issue Robert's conduct and his likely reaction to the altercation. We do have concerns, however, about the extent of the evidence admitted. While Robert's statement to the 911 operator describing defendant as a Hell's Angel and defendant's Hell's Angel shirt worn at the time of his confrontation with Robert were relevant, evidence of the Hell's Angels stickers and advertisements in defendant's vest pocket were out of Robert's view and presented a stronger case for exclusion.

However, any error in admitting evidence of defendant's Hell's Angels connection was not prejudicial in light of instructions limiting use of the evidence that were given and the state of the evidence as a whole. The court gave a limiting instruction advising the jury that Hell's Angels items found on defendant when he was arrested were "admitted for the limited purpose of determining what may or may not have been in the mind of the decedent, Mr. Shaner." The court cautioned the jury that the evidence should not be used to conclude that defendant is, in fact, "associated or affiliated with the Hell's Angels." Moreover, there was compelling evidence of defendant's guilt independent of the Hell's Angels evidence. There was essentially uncontradicted evidence of a savage beating and intentional stabbing wholly inconsistent with defendant's account. Defendant claimed he punched Robert "one time" and accidentally stabbed Robert when Robert "pivoted" into the knife defendant was holding to fend him off. Yet, Robert's neighbor testified that when Robert came to her door seeking help "he had blood all over the top of his head running down the side of his head, his eyes were red and swollen, he had gashes in his face, he had marks on his neck, he had a large gash . . . [to] his right hand, and he was generally beat up all over." The autopsy confirmed the neighbor's observations, finding that Robert had been strangled, repeatedly punched in the face with great force, and suffered deep cuts to his hand characteristic of defensive wounds incurred by a

9

person resisting knife thrusts. The fatal injury could not have been incurred by Robert turning into a knife held stationary in defendant's hand. The knife went into Robert's back and penetrated four inches. The autopsy findings were consistent with Robert's dying words: "James attacked me. He went crazy on me. He hit me, beat me and knifed me." Any error in admitting evidence of defendant's connection to the Hell's Angels was harmless.

2. *The standard jury instruction on voluntary manslaughter correctly states the law.*

Defendant claims the standard jury instruction on voluntary manslaughter, CALCRIM No. 570, misstates the law of "by suggesting that victim-caused provocation is essential to reduce murder to manslaughter" for killing in the heat of passion or during a sudden quarrel. Defendant argues that heat of passion and sudden quarrel are "two different concepts" and that victim-caused provocation is required for a heat of passion defense but not for a sudden quarrel defense. Defendant maintains that " 'sudden quarrel' replaces provocation by the victim as a cause of the passion that can reduce a homicide from murder to manslaughter" and thus provocation should not be listed as an element of a sudden quarrel manslaughter defense.

Defendant did not raise this claim in the trial court and thus has forfeited it on appeal. Defendant did not object to CALCRIM No. 570 nor seek modification of the instruction. In closing argument to the jury, defendant claimed self-defense or voluntary manslaughter without differentiating, as he does on appeal, between heat of passion and sudden quarrel.

The claim also fails on the merits because it is based on a misunderstanding of voluntary manslaughter and the role of provocation. Voluntary manslaughter is properly defined by CALCRIM No. 570, which states in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under

10

the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

The instruction correctly states that provocation is an essential element of voluntary manslaughter. "An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter (*ibid.*), if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due and reflection, and from this passion rather than from judgment." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) Defendant misconstrues provocation as "victim-caused provocation" and, from that misconstruction, reasons that provocation is not required for a killing upon a sudden quarrel. In fact, legal provocation within the meaning of voluntary manslaughter is broader than victim-generated provocation and encompasses acts or circumstances that would " 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*People v. Duff* (2014) 58 Cal.4th 527, 562.) As CALCRIM No. 570 correctly states, "no specific type of provocation is required." "Heat

11

of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." (*Ibid*.)

It has long been recognized that a killing committed "in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to provocation" is manslaughter. (*People v. Freel* (1874) 48 Cal. 436, 437.) A sudden quarrel does not replace provocation as an element of the offense, as defendant claims, but is a type of provocation. (*People v. Beltran* (2013) 56 Cal.4th 935, 946.) The jury was properly instructed.

3. *The prosecutor misstated the law in her closing argument to the jury but the errors were not prejudicial.*

Defendant contends the prosecutor committed misconduct during closing argument to the jury by misstating the law and referring to facts not in evidence. We discuss each claimed instance in turn.

Voluntary Manslaughter

The prosecutor discussed voluntary manslaughter extensively in her closing argument. She explained that the jurors had to decide if defendant "was provoked and you have to decide if you think that provocation was sufficient." The prosecutor said "defendant is not allowed to set up his own standard of conduct for heat of passion or provocation" and offered the example of a gang member who identifies with one color who angrily and impulsively kills a person dressed in another color associated with a rival gang. The prosecutor said such a killing is based on an individual standard of conduct and is not manslaughter, which uses "a community standard." She argued: "the idea behind manslaughter . . . is that we as a community all acknowledge that anyone in this circumstance would have had the same reaction." Defense counsel objected that the argument misstated the law. The court overruled the objection and informed the jurors that attorneys are allowed to argue their view of the law but the jurors must follow the instructions given by the court.

Defendant contends the prosecutor misstated the law by implying that legally adequate provocation is found only if *every* person, even "saintly individuals," would react rashly to a given situation when the correct standard requires only that a *reasonable* person be provoked. Standing alone, the prosecutor's reference to "anyone" is unclear and arguably capable of the interpretation defendant proffers. But the prosecutor soon clarified matters by explaining that the jury must decide "if a reasonable person would have been so impassioned in the same situation." Judged as a whole, the prosecutor did not misstate the law and, if she did, any misstatement was slight, quickly corrected and unlikely to mislead the jury. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647; accord *People v. Tully* (2012) 54 Cal.4th 952, 1048.)

Nor did the prosecutor misstate the law in arguing that a verdict of voluntary manslaughter requires a finding that the defendant acted from passion rather than from judgment. The prosecutor argued that defendant acted with conscious thought in removing Robert's knife from Lesley's carousel picture, folding the knife, confronting Robert, beating him, stabbing him, and fleeing the scene: "He is not so impassioned that he is not exercising judgment and flying off the handle." Defendant claims the argument was improper because one may exercise judgment while acting in the heat of passion. Defendant is mistaken. One kills in a heat of passion if one "simply reacts from emotion due to the provocation, without deliberation or judgment." (*People v. Beltran, supra,* 56 Cal.4th at p. 950.)

Defendant is correct, however, in noting one misstatement in the prosecutor's discussion of voluntary manslaughter. The prosecutor asked the jurors: "Would a reasonable person have been so impassioned that they would have killed in this situation? . . . We could expect you to be upset if you think someone is putting your girlfriend down and calling her bad names and scaring her. Would the reasonable person be so upset that they would kill? That's for you to decide."

The California Supreme Court has rejected the view that "provocation must be of a kind that would cause an ordinary person of average disposition *to kil*l." (*People v. Beltran, supra,* 56 Cal.4th at p. 938.) The court explained that "provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Id.* at p. 949.)

Defendant failed to object to the prosecutor's misstatement of the law, thus forfeiting the issue on appeal. (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) Moreover, the error was harmless. Most of the prosecutor's recitation of the law on manslaughter was correct and properly focused on the defendant's state of mind. The jury was also properly instructed to direct its attention to determining whether "the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment." (CALCRIM No. 570.) The court cautioned the jury that the prosecutor and defense counsel may argue their view of the law but that the jury must follow the court's instructions. We presume the jury followed that instruction. (*Najera, supra,* at p. 224.)

Self-defense

The prosecutor addressed defendant's claims of self-defense and imperfect self-defense in closing argument to the jury. The prosecutor argued that Robert's vandalism of Lesley's picture was "mean" but that Robert presented no present physical danger to Lesley or defendant. The prosecutor maintained that defendant pursued Robert into the kitchen, attacked him by throwing him against the refrigerator, and proceeded to beat and stab him without any real or perceived threat from the far smaller Robert. The prosecutor said self-defense and imperfect self-defense "cannot be contrived, it does not apply to the aggressor. If you do indeed find that the defendant in seeking out Mr. Shaner and throwing him against the refrigerator, is the aggressor in this situation, self-defense doesn't apply and imperfect self-defense doesn't apply. They are both off the table."

Defendant contends the prosecutor misrepresented the law of self-defense. The contention is forfeited for failure to object in the trial court and, in any event, is meritless. The prosecutor correctly stated the law. As the jury was instructed, "The right to use

14

force in self-defense or defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." (CALCRIM No. 3474.) Also, "A person does not have the right to self-defense or defense of others if he or she provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) By statute, one may not claim self-defense if one was the aggressor absent an effort "to decline any further struggle before the homicide was committed." (§ 197, subd. (3).) The prosecutor did not misrepresent the law in referring to this well-established principle.

Food Stamp Application

Defendant claims the prosecutor referred to facts not in evidence in discussing an exhibit that was marked in evidence but not admitted. The exhibit was, in fact, admitted in evidence and thus a proper subject of closing argument.

At issue is People's exhibit 48, which is a packet of papers found at defendant's home with his name on them used as indicia of residency. Among the papers is a food stamp application defendant signed a week before the stabbing in which defendant declared, under penalty of perjury, that he had no income. The prosecutor noted that defendant told the police he was working and argued that defendant lied either to the police or to the welfare agency, showing defendant to have "an honesty problem." The prosecutor proceeded to question the truthfulness of defendant's other assertions to the police.

Defendant contends the referenced exhibit was not admitted in evidence. The exhibit list, however, shows the evidence as both marked for identification and admitted on March 23, 2012, during witness testimony. Defendant says the exhibit list is in error and points to the trial judge's statement, recorded in the reporter's transcript for that day, deferring a ruling on admissibility. Defendant overlooks the possibility that a ruling was made later that was not transcribed by the court reporter. We note that the court, on March 26, 2002, said the exhibit had been admitted "after the cross."

Even if defendant is correct and the exhibit was not admitted on the day indicated in the exhibit list, it was certainly admitted before the prosecutor referenced it in closing

argument. When the prosecutor began to discuss the exhibit, defense counsel objected and a discussion between court and counsel was held off the record. A record of the objection was later made outside the presence of the jury. In objecting, defense counsel said he did not think the exhibit had been admitted and questioned its relevancy. The court said the exhibit was admitted and overruled the objection. If the document had not been admitted previously, it was admitted during closing argument, before the prosecutor commented upon it.

Defendant's credibility

The prosecutor returned to the issue of defendant's credibility in her rebuttal. The prosecutor quoted a portion of CALCRIM No. 226: "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says." The prosecutor remarked: "This is an important principle. It applies not only to the defendant's statement, but it applies to any other witnesses." Defense counsel objected and, following a discussion at the bench, the objection was overruled. The prosecutor continued her argument: "So ultimately, ladies and gentlemen, you are going to be the judges of credibility of everybody that testified, and even of the defendant when you look at his statement."

The prosecutor erred by including defendant's police statement within the ambit of CALCRIM No. 226, which is concerned with witnesses who testify under oath. But we reject defendant's contention that the error was prejudicial. The jury was called upon to evaluate the credibility of defendant and trial witnesses alike. The jurors were instructed to determine if there were conflicts in the evidence and to "decide what evidence, if any, to believe." (CALCRIM No. 302.) The jurors were also instructed that if defendant "made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt." (CALCRIM No. 362.)

Defendant argues that CALCRIM No. 226 encourages the jury to disregard the entire testimony of a witness who lied about one thing and, in invoking that instruction,

16

the prosecutor subjected defendant's police statement to an exacting standard that should not apply to unsworn statements. CALCRIM No. 226 is not as exacting as defendant represents. The instruction does provide, as the prosecutor noted: "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says." (CALCRIM No. 226.) But the instruction also provides: "[I]f you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (CALCRIM No. 226.) The instruction did not relieve the jury of its obligation to evaluate the credibility of defendant's various statements to the police, both exculpatory and inculpatory.

*4. The trial court did not err in removing a juror during deliberations upon learning the juror concealed material information on voir dire.*

Defendant contends the trial court violated his right to due process by removing a juror during deliberations. The Attorney General maintains that removal was proper because the juror concealed material facts during voir dire that raised an inference of bias.

Facts

On the second day of deliberations, the foreperson sent a note to the judge complaining that two jurors were not following instructions. The judge questioned the foreperson with the prosecutor and defense counsel present. The foreperson said she and about six other jurors were concerned that Jurors Nos. 36 and 92 were speculating and not focusing on the instructions. The court questioned both jurors. Relevant here is Juror No. 36. The court asked Juror No. 36 if she had any concerns with the instruction requiring her "not to speculate or consider things that are not in the record" and she said "no." The court noted that a murder case can affect people emotionally and asked if the case was "tough" for her. Juror No. 36 replied: "No, I'm fine with it. I've been around a lot, so it's – you know, I've experienced a lot of stuff so it's not bothering me emotionally or mentally or anything." The judge advised her, "we all have our life experiences . . . [b]ut . . . you can't bring in thoughts of what you've experienced in life

17

and apply it as evidence." The juror said she understood. The court saw no cause to excuse Juror No. 36 and deliberations resumed.

Juror No. 36's comment about experiencing "a lot of stuff" led the prosecutor to investigate. The next day, the prosecutor told the court the juror had arrests for domestic violence and other criminal offenses that the juror concealed during voir dire. A jury questionnaire asked several questions about the prospective jurors' personal experiences with crime: "Have you[,] a family member[,] or household member or close friend ever been a victim, witness, or defendant in a criminal matter?"; "Have you or any of your immediate family members or close friends ever been a victim of a serious physical assault?"; and "Have you or any of your immediate family members or close friends ever been a suspect or charged with a crime?" Juror No. 36 answered "no" to each question.

In fact, the juror had been arrested in September 2009 for infliction of personal injury on a spouse. (§ 273.5, subd. (a)) The arresting agency was the same as the investigating agency in the present case. The prosecutor in the present case had "personally reviewed" the file and charged Juror No. 36 with four criminal counts, including assault with a deadly weapon. (§ 245, subd. (a)(1).) The prosecutor had not recalled during voir dire that she had filed a criminal complaint against the juror. Juror No. 36 had been referred to the public defender and appeared in court on the 2009 incident. The case was ultimately dismissed but a restraining order remained in effect at the time of defendant's trial. The juror had also been arrested, but not convicted, in 2004 for domestic violence and in the 1990s for drunk driving and driving with a suspended license.

The court questioned Juror No. 36. The court said the juror's comments led it to check the files, where it was discovered she had been arrested for domestic violence.The court asked Juror No. 36 why she said "no" when asked on the juror questionnaire if she had ever been charged with a crime. The juror replied, "Okay. Um, are you under the impression that I was involved in something? Because when I went to court for that it was dismissed so I was under the assumption that, you know, that was beside me and no longer a question of — because it was dismissed." The juror further explained that the

18

2009 arrest involved an "accident" with her ex-husband. The juror did not remember who the Deputy District Attorney was on the case. The court asked Juror No. 36 if she had other arrests for domestic violence and she said, "Um, no. Not that I recall ever" but also said "I had a very rocky marriage for a long time." The court asked "How about in 2004?" and the juror, at first, said he did not remember being arrested but then said her husband called the police because she threw a salt shaker at him. The court asked Juror No. 36 if the arrests and allegations against her were influencing her process as a juror. The juror said "Absolutely not."

The court asked if a weapon was involved in the 2009 incident. The juror said a knife was involved. Asked to explain, the juror gave a long description of her relationship with her husband then said: "one morning I got up and he was sleeping on the couch and he had been very, very, very nasty, cutting me with words like a knife, and I got a knife out and said, 'Good morning, son of a bitch.' He woke up and hit the knife and cut himself. Then he calls the cops and made a big scene and everything, but it was truly an accident." The juror said, "I'm not a violent person — I did not thrust the knife at him in a stabbing manner, so it was just something like that."

The prosecutor asked the court to remove Juror No. 36. The prosecutor said "We had many discussions with the panel about domestic violence and those sorts of things and none of this was brought up. It was like it didn't exist. And then to hear her say . . . that she stabbed him with a knife but she didn't thrust the knife at him . . . in a stabbing manner, it was an accident, it sounds like such a similar issue as to what's at issue in this case that I can tell the court that had we had truthful answers . . . the People would have sought to excuse her for cause. And we find that her failure to tell the truth on the questionnaire is very problematic." The prosecutor said Juror No. 36 falsely answered no to multiple questions, including the question "Have you or anyone in your household ever owned, carried or used a knife as a weapon?"

Defense counsel said the juror had not been deliberately evasive but mistakenly thought that dismissed charges were "water under the bridge" that did not have to be reported on the juror questionnaire. As for the knife, counsel noted that Juror No. 36 said

she accidentally cut her husband. Defense counsel argued that the "bottom line is whether she can deliberate what's in front of her" and the juror indicated she could.

The court removed Juror No. 36 and replaced her with an alternate. The court explained the basis for its decision: "I watched her carefully while we were talking and I noted a number of things. One, she was speaking very fast and I was trying to interact with her and she wouldn't really let me get in on some of my comments to her. She tells a big story. I also consider the previous comments by the jury foreperson about her conduct. And in listening to her story it sounds vaguely familiar. An incident involving domestic violence with her spouse where her spouse was apparently not a very good person in her mind. A knife comes out. A knife is used. He's cut. This has so much similarity to our case here that I don't see how it cannot affect her ability to be fair. And honestly, after looking at her responses to the questions and her explanation, she didn't really explain, well, how she could misunderstand [questions asking about criminal] charges . . . or [being a] suspect in a criminal matter when she had been arrested twice on domestic violence matters. I do believe that she was untruthful in her response."

Discussion

"The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. (§ 1089.) 'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.] [Citation.] If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review. [Citations.] 'Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 588.)

"Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation], we have concluded 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal." (*People v. Lomax, supra,* 49 Cal.4th at p. 589.) The California

20

Supreme Court has held that "the basis for a juror's disqualification must appear on the record as a 'demonstrable reality.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*Ibid.*)

The evidence fully supports the juror's removal. " '[I]ntentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644.) The trial court reasonably concluded that Juror No. 36's failure to disclose her arrests for domestic violence was intentional given multiple questions on the subject and her unequivocal denials. In finding intentional concealment, the trial court noted that Juror No. 36 wrote "Don't understand" on the juror questionnaire when responding to some questions yet expressed no lack of understanding when answering "no" to questions asking if she had ever been a defendant in a criminal matter or charged with a crime. The court concluded that the juror's responses were deliberate misrepresentations, not inadvertent errors caused by misunderstanding the questions. " 'Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. . . . . [T]he trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination.' " (*Ibid.*)

The evidence also supports the trial court's finding that the concealed information was material to the case. Juror No. 36 had been twice arrested for domestic violence, including an incident involving use of a knife. Domestic violence was a central issue in the case being tried, as was use of a knife by one claiming accidental infliction of injury. The court found the incident involving Juror No. 36 shared "so much similarity to our case here that I don't see how it cannot affect her ability to be fair." A proper basis for

21

removing the juror "appear[s] on the record as a 'demonstrable reality.' " (*People v. Lomax, supra,* 49 Cal.4th at p. 589.)

Defendant maintains that Juror No. 36 was discharged because she may have been holding out for acquittal. The discharge of a holdout juror raises special concerns because " 'a unanimous criminal verdict is an important safeguard [that] rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case.' " (*People v. Harrison* (2013) 213 Cal.App.4th 1373, 1382.) These concerns do not arise here because Juror No. 36 was not a holdout juror and her evaluation of the case played no role in the decision to remove her from the jury. The investigation of Juror No. 36 occurred early in the deliberation process and was prompted by the foreperson's complaint that two jurors were not following the law as instructed by the judge. No deadlock in the jury's deliberations was reported and the individual jurors' views on the merits of the case were never revealed. Juror No. 36's removal was not based on her position on the merits, which was unknown to court and counsel. Nor was her removal based on the complaints of some of her fellow jurors that she was not following the court's instructions. Defendant suggests that such complaints may derive from disagreement on the merits of the case and thus provide weak support for juror removal. (*United States v. Symington* (9th Cir. 1999) 195 F.3d 1080, 1088.) In this case, complaints that Juror No. 36 was not following instructions initiated an investigation but those complaints were not the basis for removal. Juror No. 36 was removed because further investigation disclosed the juror intentionally concealed material information during voir dire. The impetus for Juror No. 36's removal came from misrepresentations she made during voir dire, not from her position on the merits of the case. Federal authority criticizing the removal of a juror where it is "reasonably possible that the impetus for . . . dismissal came from her position on the merits of the case" is thus inapplicable. (*Ibid.*) Juror removal was proper.

## Disposition

The judgment is affirmed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Siggins, J.