Filed 3/26/15  P. v. Salazar CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


THE PEOPLE,

    Plaintiff and Respondent,

    v.

JUAN CARLOS SALAZAR,

    Defendant and Appellant.

D066882

(Super. Ct. No. FBA900513)


APPEAL from a judgment of the Superior Court of San Bernardino County, Victor R. Stull, Judge.  Reversed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L. Garland, Assistant Attorneys General, William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Carlos Salazar of nine counts of lewd acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)), and found true allegations that as to counts 1 through 7, there was more than one victim (Pen. Code, § 667.61, subd. (b)). The court sentenced defendant to 58 years to life in state prison, consisting of consecutive indeterminate 15-year-to-life terms on counts 1, 2 and 7, a determinate low term of three years for count 3, and determinate consecutive two-year terms (one-third the midterm) for counts 4, 5, 6, 8 and 9. Defendant contends the trial court abused its discretion in dismissing one of the jurors, Juror No. 3, during the deliberations because the record does not establish as a demonstrable reality that she refused to deliberate or was unable to perform her duties as a juror. He also contends the court's admission under Evidence Code section 1108 of evidence of his uncharged sexual misconduct violated his right to due process under the state and federal constitutions and equal protection of the law, requiring that the judgment be reversed.

Because grounds for Juror No. 3's discharge do not appear in this record as a demonstrable reality, and the trial court's findings are not manifestly supported by the evidence, we conclude the court erred by dismissing Juror No. 3. We reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant does not advance a sufficiency of the evidence challenge, so we briefly summarize the acts underlying his convictions.

Sometime before 2006, defendant lived with a woman and her children, including Michelle, who was 19 years old at the time of trial, and Mark, who was a year and 10

2

months younger than Michelle. Defendant worked as an 18-wheeler truck driver and sometimes took Michelle and Mark with him on deliveries or other places in their mother's van. Michelle estimated that at various times when she was between 11 and 15 years old, defendant told her to masturbate him. On one occasion, he gave Michelle and Mark alcohol to drink then asked Michelle if he could pay her to have intercourse with him. When she declined, he offered her $20 to masturbate him, which she did. On another occasion, defendant made Michelle and Mark watch pornography with him at their house while he masturbated to it. Defendant had Michelle orally copulate him once. On another occasion, defendant entered Michelle's bedroom and put his penis close to her face. Another time in his truck, defendant also made Michelle and Mark orally copulate each other while he watched.

The prosecution presented the testimony of defendant's daughter Yadira under Evidence Code section 1108. Yadira testified that in 2000, when she was 13 years old, defendant took her into a bedroom of their home, removed his penis from his pants and asked her a couple of times to touch it. Yadira said no and ran from the room. Yadira told her mother about the incident three years later, and in 2009, Yadira gave a statement to police.

Defendant testified at trial, and denied the acts. He claimed had had given Yadira a condom after catching her with a boy in her bedroom. He claimed that in 2008, when the allegations about Michelle and Mark arose, he had left their mother and was seeking custody of his other two girls from her. He made the same claim about Yadira; that in 2003 he was asking for custody of his children from her mother.

3

DISCUSSION

I. *Dismissal of Juror No. 3*

Defendant contends the trial court erred by dismissing one of the jurors, Juror No. 3, during their deliberations based only on an inquiry of the jury foreperson and Juror No. 3, and no other jurors. He maintains the court's insufficient inquiry, combined with its misinterpretation about the scope of its discretion, led to an arbitrary and capricious decision, constituting an abuse of discretion.

A. *Background*

The jury commenced deliberations shortly after about 9:00 a.m. on August 14, 2012. After it reassembled the next day, the jury asked for a read-back of Michelle and Mark's testimony. Deliberations resumed on and off throughout the day, and the read-back was completed by 3:40 p.m., after which the jury left for the day. Just after 11:00 a.m. on the third day of deliberations, the jury foreperson sent a note to the judge indicating that one of the jurors, Juror No. 3, was "not cooperating, wants to leave, making people feel uncomfortable. She is sitting in the restroom and does not want to cooperate." The foreperson also requested all of Mark's testimony. The court, with counsel present, decided to question the foreperson about the matter. The court confirmed that the jury had started deliberating two days previously and asked the foreperson how Juror No. 3's behavior had been "from beginning to—up to the present." They had the following exchange:

"[Juror No. 12]: Her behavior has gotten a little aggressive, I want to say from the day that we started to where we are at today. She's—it's a little hard for us to work as a

4

group because it's just—she's just not wanting to be part of the group. Sometimes she turns her chair around. She doesn't want to participate in some of the conversations that we have. She put herself in the bathroom this morning for a little while. One of the other jurors went in there, talked to her. She came out right after that. I don't know what was said in the bathroom, but she did start participating a little more. And she's more—a little less aggressive than what she was. So I don't know what that conversation was. And that was after I sent the note.

"The Court: When you say 'aggressive,' is it her attitude or the words she's using?

"[Juror No. 12]: Her attitude. No, no, the words, no. She's very—her words are not bad. They are not vulgar or nothing like that. She's just not—I guess you could say not a team player. But, like I did say, after this conversation that this—one of the other jurors went into the bathroom to go talk to her, she now has a little—she's getting a little more participant."

The court confirmed that Juror No. 3 knew the foreperson had sent the note, and the foreperson advised the court that she did not tell Juror No. 3 that she was sending a note about her, but that the juror "might have that feeling that this was about her . . . ." The court asked the foreperson whether she had talked to Juror No. 3 about her participation:

"[Juror No. 12]: Not yet. I was going to after lunch. I think the lady that did talk to her did tell her something about her participation, and maybe that's probably the reason why she started to participate a little bit more, but I am going to talk to her right after lunch.

5

"The Court: Okay. Without revealing her position, has she taken a position with respect to any of the counts, or what's her attitude about actually coming to a decision?

"[Juror No. 12]: Her attitude is very strong, just very, very strong. And right— like I said, right afterwards she's kind of changed, not as strong as it was before.

"The Court: When you say 'strong,' is it—does it appear that she has her mind made up with respect to the case in general?

"[Juror No. 12]: Yes.

"The Court: And how early did it appear to you that she arrived at that decision?

"[Juror No. 12]: From the beginning.

"The Court: Did she participate in any of the discussions before giving you the feeling that she had made up her mind?

"[Juror No. 12]: Yes.

"The Court: She did for a while?

"[Juror No. 12]: She did for—for the first day, then the second day this is it . . . , not changing, . . . , that was it. Then, like I said, I don't know what was said in the bathroom, but it did change the last 20 minutes, right after I had given the note."

The Court initially stated it was inclined to leave the matter alone, allow the foreperson to speak to Juror No. 3, and see if the issues could be worked out among the jurors. After consulting with counsel outside the foreperson's presence, the court decided to inquire more specifically with the foreperson about Juror No. 3's conduct.

6

"The Court: The first two words of your note to me were 'not cooperating.' And that basically is shorthand for what you have told us before, that once she made up her mind then she wouldn't participate in the discussion. Is that correct?

"[Juror No. 12]: Correct.

"The Court: Okay. Wants to leave. Did she actually express that she wanted out of there or, I mean, what made you write that?

"[Juror No. 12]: She just said I just want to leave, and, you know, this is—get this over with, kind of. That's kind of like what she expressed.

"The Court: Okay. In terms of what you wrote, that she's making people feel uncomfortable, elaborate on that a little bit for us.

"[Juror No. 12]: Like yesterday she had her chair and she turned it to the wall. Many times she pushes her chair all the way back to the wall. And this does make people feel uncomfortable, especially when you turn your back on the rest of us. There is 12 of us. There is 11 of us all participating and one of them has their chair turned around to the wall. That doesn't make anybody—all the rest of the 11 of us feel uncomfortable when she pushes her chair back and she gets upset. Because it's not going her way, she will push her chair back and I'm not participating, do whatever you want type thing is what she's saying."

"The Court: Does she say that aloud or that is her body language?

"[Juror No. 12]: Her body language."

The Court confirmed that Juror No. 3 spoke with another juror in the bathroom that morning while the foreperson was writing her note, and that the bailiff came to get

7

the note before Juror No. 3 left the bathroom. According to the foreperson, Juror No. 3 was in the bathroom between 10 and 15 minutes. The court asked the foreperson if it would help for the court to speak with the juror, and she responded that it would, but she proposed speaking to the juror first, then having the court to talk to her "if she is still being her behavior not to where it should be. . . . But I think if I talk to her first she wouldn't be going the other way. [¶] . . . [¶] Where she would get mad or pissed." The foreperson stated that Juror No. 3 adopted her attitude immediately after lunch on the first day of deliberations.

Outside the jurors' presence, the prosecutor told the court she wanted it to speak with Juror No. 3. Defendant's counsel expressed concern about the situation and uncertainty about whether the facts showed Juror No. 3 was failing to cooperate. He observed the juror might not be feeling her time was well spent trying to change minds when jurors were not changing their minds her way: "I don't know which way this person is voting, obviously, but, if they've come to a decision and they have expressed a decision as to a certain way and has [*sic*] continued to do so, I don't know that that's failing to cooperate." When the court indicated it would speak with Juror No. 3 after lunch, defendant's counsel reminded the court that the foreperson wanted to speak with her first, and in his view, that was the more appropriate course than possibly alienating her more. The court stated: "I understand the concern. . . . But . . . if it is a problem and I allow it to continue, then potentially we are wasting a lot of time, if the juror ultimately is dismissed. If I hear something from [Juror No. 3] that leads me to conclude that I

should exercise my discretion and dismiss her, I'd rather do it now, rather than waste a lot more time and do it later."

After the afternoon break, the court questioned Juror No. 3. The court told her it had been advised she was not contributing to the discussion and asked whether that was accurate. She responded that it was inaccurate, and when asked to describe her participation said, "I have been speaking as I feel. I have been speaking according to the evidence. There is a lot of over talk. There is a lot of interruption, but I'm deliberating. And I deliberated until we went to lunch [this afternoon]." She explained her interaction as "[t]rying to get jurors to—that don't see, try to get them to see. Sometimes it comes to a point that no matter—I feel that there is nothing else that I can say on a particular topic that would change anybody else's mind." In response to questioning, she confirmed she could render a decision on all nine counts, but did not think the other jurors were in the same frame of mind "at this point . . . but anything is possible." She made the jury aware that morning that she might change her mind after further deliberation. Juror No. 3 confirmed that she had entered the restroom, but said she was there no more than five minutes during a period that the jury was waiting for a court reporter and deliberation could not continue without the reporter due to questions about testimony. Juror No. 3 told the court she "[a]bsolutely" had an open mind, that she had been through the case from the beginning, and wanted to see it through to the end. She explained: "I'm not trying to be disrespectful. I'm not trying to be rude. I'm not trying to not be a participant. It's just that sometimes when you disagree and—have you ever had, perhaps, a

9

disagreement with your wife and you are like, well, there is really nothing else I can say—[¶] . . . [¶] . . . on a particular issue? Not the case as a whole."

After Juror No. 3 left, the prosecutor asked the court to dismiss her, stating she felt Juror No. 3's remarks were "disingenuous" and untruthful as to whether she in fact had an open mind on the matter. She pointed out the foreperson had said they had not yet gone through the counts and Juror No. 3 had already made up her mind; that she was disruptive and physically isolating herself by pushing her chair away and turning her back on them; and also "throwing tantrums." The prosecutor said that according to the foreperson, Juror No. 3 was not complying with the instruction making it the jurors' duty to talk with one another and deliberate in the jury room and decide the case only after discussing the evidence with the other jurors. Defense counsel disagreed, stating he felt Juror No. 3 was voicing her frustrations, which was appropriate in an impasse. He felt that to assess the charge she was being disruptive, they needed to hear from all 12 jurors as to whether that was true and she was refusing to deliberate.

The court stated that it had personally observed Juror No. 3 outside sleeping on a bench away from other jurors who were amicably chatting, and that the court "saw her as somewhat isolated." It pointed out the juror had told them she was prepared to vote on all nine counts. The prosecutor took that to mean that Juror No. 3 had reached a decision before the jurors had discussed all of the evidence. The prosecutor added that the juror appeared hostile, an assessment with which defense counsel disagreed: "I do agree that she did appear defensive. . . . [S]he's been brought in front of the task master to explain her actions. I mean, I can understand her being defensive of that. I don't think she was

10

hostile before the Court. Quite the opposite. I think that she was trying to explain her position to the court." Defense counsel saw Juror No. 3 as "fervent in what she thinks should happen" and wanted to see the case to the end.

The court questioned the foreperson once again. The foreperson confirmed that initially, the jury had taken a collective vote on all nine counts, and then started going through each count individually. At that point, after a little less than two and a half hours of deliberation, Juror No. 3 said, "This is how I feel, this is what it is, and you're not going to change my mind, period, I'm not going to do anything else other than this." The court asked whether from that time until the time the foreperson wrote her note Juror No. 3 was particularly or mostly silent, and the foreperson responded that Juror No. 3 was "not mostly silent. She would view her points, and she was getting upset with the other people because she was saying they were fine. And she made a point to me to let her know that was upsetting her, other things upset her. She was just, you know, not being cooperative. She would, like I said, turn her chair around, push her chair back. Then she said, Okay, now I'm going to shut down, I'm just going to shut down. And then after about 15 minutes of coolness then she would view her point of what we were talking about." The foreperson related that Juror No. 3 had originally been appointed the foreperson, but when she (the foreperson, Juror No. 12) read something, Juror No. 3 got upset and told Juror No. 12 to take the position. After the foreperson took the position, Juror No. 3 told her she was offended. According to the foreperson, "That was in the morning at the beginning, and it kind of like went from there when we first started."

11

In response to defense counsel's questioning, the foreperson stated that Juror No. 3's remarks were directed both toward deliberations and to voice her frustrations. The prosecutor confirmed with the foreperson that when Juror No. 3 said she was done, the jury was still in the process of going over the facts of the case.

After the foreperson left, the trial court stated: "I was willing to give [Juror No. 3] the benefit of the doubt until we heard again from [the foreperson]. It just occurs to me and strikes me rather positively that after only a short period of time, approximately two and a half hours, perhaps not quite that long, she had made up her mind. And, based on what I've heard and her responses, I, frankly, don't trust her to be able to deliberate with an open mind any further." Defense counsel responded that he thought after the initial vote, Juror No. 3 had tried to explain why she voted and convince them as to her position, and that she returned to deliberate without knowing about the foreperson's note. He felt Juror No. 3 still had an open mind, was still trying to deliberate with the other jurors, and was frustrated that some were not allowing her to express her views. He pointed out she had changed her mind as to one point. He felt the most appropriate course was to allow the foreperson to talk to Juror No. 3 and resolve the situation. When the court pointed out that Juror No. 3 had already made up her mind on all counts, defense counsel said, "That's not necessarily inappropriate. At this point, based on the evidence she has before her, and I don't think all of the readback has been completed, that she has not had anything to change her point of view. Sounds like other people are of the same mind, that they are—they are arguing their points of view." The court responded, "But I have not heard that other people are engaging in the same behavior, and that to me carries a

12

certain amount of weight.  I don't like the idea of dismissing her.  I don't like the idea of having this jury start the deliberations all over again.  But I do like the idea of having a set of jurors who can work together and work through every count, every necessary fact of—if need be and arrive at a verdict."

Over defense counsel's objection, the court dismissed Juror No. 3.  It reasoned: "First is what we have from both jurors.  Next, my observation about—or separation from the group over the lunch hour.  And I will freely admit I didn't see any other—have the opportunity to observe any other interaction between the jurors over the lunch hour or during breaks or anything else, so it may—I may be criticized on basing a decision based on one observation.  Her demeanor while—I'm speaking now of [Juror No. 3], to me did seem somewhat defensive.  But I think [defense counsel] has a valid point of being called in front of the principal, so to speak, might put someone on the defensive.  And I've already articulated what I thought about specific statements being made by both jurors that we've interviewed here.  I think that's enough."  After she was excused, Juror No. 3 said, "Your honor, I'm really sorry that you feel this way.  Thank you."

B.  *Legal Principles*

Our state's high court has emphasized:  "Great caution is required in deciding to excuse a sitting juror.  A court's intervention may upset the delicate balance of deliberations.  The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence.  This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case.  The fact that other jurors may disagree with a panel member's conclusions, or

13

find disagreement frustrating, does not necessarily establish misconduct." (*People v. Allen* (2011) 53 Cal.4th 60, 71.)

Nevertheless, the law permits the trial court to discharge a juror at any time, including during deliberations, based on a showing of "good cause" that the juror is "unable to perform his or her duty." (Pen. Code, § 1089; see *People v. Wilson* (2008) 43 Cal.4th 1, 25.) " ' "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]" [Citation.] . . . "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 898; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.) Whether and how to investigate an allegation of juror misconduct is a matter of the court's discretion. (*People v. Allen*, *supra*, 53 Cal.4th at p. 69.) The court "must conduct 'whatever inquiry is reasonably necessary to determine' " whether grounds for discharging the juror exist. (*People v. Cleveland* (2001) 25 Cal.4th 466, 480.)

" 'A juror who refuses to follow the court's instructions is "unable to perform his duty" within the meaning of Penal Code section 1089.' " (*People v. Wilson*, *supra*, 43 Cal.4th at p. 25.) This includes instructions that "each juror render a verdict 'according to the evidence presented and the instructions of the court' " (*ibid*.) or that each juror " 'will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict.' 'A juror who actually refuses to deliberate is subject to discharge by the court [citation] . . . .' [Citations.] 'A refusal to deliberate consists of a juror's

14

unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.' " (*Wilson*, at pp. 25-26.)

On the other hand, "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 485.)

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality test entails a more comprehensive and less deferential review' than substantial evidence review. 'It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias [or other good cause for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable

15

reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*People v. Homick*, *supra*, 55 Cal.4th at p. 899; see also *People v. Fuiava* (2012) 53 Cal.4th 622, 712; *People v. Wilson* (2008) 44 Cal.4th 758, 821 [a juror's inability to perform as a juror "requires a 'stronger evidentiary showing than mere substantial evidence' "]; *People v. Harrison* (2013) 213 Cal.App.4th 1373, 1383.)  In assessing the trial court's ruling, the reviewing court must "consider not just the evidence itself, but also the record of reasons the [trial] court provides."  (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.)

C.  *Analysis*

Defendant contends the record does not show to a demonstrable reality that juror No. 3 was unable to perform her duty as a juror.  He maintains the court did not conduct an adequate inquiry into the matter, having limited its questions to the foreperson who raised the issue and Juror No. 3.  He further argues its discretion was not exercised in accordance with the applicable legal standards in that Juror No. 3's strong or even unreasonable opinions during the second or third day of deliberations did not constitute a refusal to deliberate, and her ability to vote on all nine counts two days into deliberations did not render her any less or more capable of further discussion than any other juror. Defendant argues the court's finding to the contrary is not supported by the record or the law, since Juror No. 3 indicated she had changed her mind as to one issue and was "absolutely" capable of having an open mind, and the jury foreperson admitted her attitude had changed and she had started participating "a little more" after the third juror

16

spoke with her. According to defendant, the record merely shows Juror No. 3's frustration with fellow jurors "periodically manifested itself in the 'silent treatment' " that was not long-lived and did not prevent her from returning to the table to express her opinions.

Having reviewed the entire colloquy pertaining to Juror No. 3's actions, as well as the trial court's stated reasons, we conclude Salazar's contentions have merit. Several flaws are apparent in the trial court's handling of the matter. We are cognizant that the nature and extent of a trial court's investigation into such a matter is a matter of its discretion. (*People v. Allen*, *supra*, 53 Cal.4th at p. 69.) The foreperson's complaint about Juror No. 3 pertained to her conduct inside the jury room in view of the entire jury, and Juror No. 3's account differed significantly from the foreperson's complaints. The trial court, however, limited its inquiry about Juror No. 3's behavior to Juror No. 3 and the foreperson, even though the foreperson informed the court that another juror had spoken with Juror No. 3 privately, after which Juror No. 3's attitude and participation improved. The court did not see fit to question the third juror who had spoken privately with Juror No. 3 or any other juror to ascertain additional information and try to resolve the conflicting stories about Juror No. 3's conduct, declining defense counsel's request that the court question all of the jurors. (Compare *Allen*, *supra*, 53 Cal.4th at p. 70 [rejecting defendant's contention that trial court abused its discretion by interviewing all of the jurors to ascertain whether they could provide additional information about one juror's assertion suggesting that juror had decided the case before it was submitted];

17

*People v. Wilson*, *supra*, 44 Cal.4th at p. 826 [court questioned all 12 jurors before deciding to discharge a juror]; *People v. Cleveland*, *supra*, 25 Cal.4th at pp. 471-473.)[1]

Second, the court did not take lesser steps to ameliorate the situation as by calling in the entire jury and admonishing or reinstructing it as to its duties, or by first conducting a limited inquiry with jurors other than Juror No. 3 to confirm the foreperson's account. (See, e.g., *People v. Allen*, *supra*, 53 Cal.4th at p. 74 [trial court did not attempt to resolve a claim that a juror had prejudged the case with curative instructions and ultimately erred by dismissing the juror]; *People v. Alexander* (2010) 49 Cal.4th 846, 923-925, 926, 928 [after questioning foreperson concerning another juror's alleged lack of cooperation or discussion, court's action in rereading instructions concerning how the jury should deliberate was not an abuse of discretion; the court is authorized to take less drastic steps than discharge of a juror to deter any misconduct or misunderstanding it has reason to suspect]; *People v. Cleveland*, *supra*, 25 Cal.4th at p. 480 [it is often appropriate for a trial court that questions whether all of the jurors are participating in deliberations to reinstruct the jurors regarding their duty to deliberate and

---

[1]     Concededly, "a trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 485.) But here, the court would have been well within its discretion to inquire of the other jurors about Juror No. 3's claimed isolating conduct in the jury room, whether she in fact pushed her chair away, faced the wall, and left the room for long periods during deliberations.

to permit the jury to continue deliberations before making further inquiries that could intrude upon the sanctity of deliberations]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1350-1352 [when faced with a request to remove " 'a few hostile jurors,' " court asked the jury as a whole whether they could continue deliberations and reread several jury instructions concerning its duty to deliberate]; *People v. Diaz* (2002) 95 Cal.App.4th 695, 700-702 [questioning several jurors then bringing all of the jurors in for rereading of instructions relating to juror duties before deciding the next day after further questioning to dismiss a juror].)  Nor did the court permit the foreperson to attempt to resolve the matter.  Rather, although the foreperson expressed a desire and willingness to speak with Juror No. 3 before the court inquired of her, the court out of a concern that not speaking with her itself might "waste a lot more time," called Juror No. 3 into the courtroom and confronted her on her behavior.  Under the circumstances here, the court erred by not taking a more limited or measured approach in that aspect of its investigation:  "[T]o ensure the sanctity and secrecy of the deliberative process, a trial court's inquiry into grounds for discharging a deliberating juror *should be as limited as possible*, and should cease once the court is satisfied that the juror in question 'is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 53, italics added.)

Having viewed the record as a whole, it does not otherwise reflect as a demonstrable reality that Juror No. 3 was unable to function as a juror or had prejudged the case.  The court based its dismissal of Juror No. 3 on three grounds:  (1) the

foreperson's and Juror No. 3's responses to its questions after the foreperson sent her note; (2) the court's observation that Juror No. 3 was sleeping on a bench some distance from other jurors while they chatted outside the courtroom; and (3) Juror No. 3's attitude and defensiveness during her questioning by the court. But the foreperson's account, which as we have stated conflicted with Juror No. 3's account, did not reflect that Juror No. 3 had prejudged the case or that she exhibited a total failure to deliberate or participate: the foreperson recounted that Juror No. 3 "sometimes" turned her chair around and did not want to participate in "some" of the conversations. Further, the foreperson confirmed that after Juror No. 3's private discussion with the other juror—immediately after the foreperson sent her note—Juror No. 3's attitude had changed and she got "a little more participant." The foreperson also had confirmed that the jury took a vote on all nine counts at the outset and the jury spent the next day listening to a readback of testimony; for Juror No. 3 to have related that she was prepared to vote on all counts at the point of the third day of deliberations is not extraordinary or indicative of any inclination to ignore the jury's discussions or refusing to deliberate. The foreperson's opinions about Juror No. 3's behavior, including that she was not a "team player," should not have played any role in the court's ruling. (*People v. Allen*, *supra*, 53 Cal.4th at p. 75.) Juror No. 3's "conduct during deliberations may have annoyed other jurors, but that is not dispositive evidence that [she] had prejudged the case." (*Id*. at p. 74.) "Great tension may arise when a group of people are asked to make an important decision and views vary. While some jurors may be understandably impatient that another will not adopt their view and

20

abandon his or her own, the mere failure to change a vote is not necessarily misconduct."
(*Id*. at p. 75.)

The court's observation of Juror No. 3's conduct outside the courtroom—sleeping on a bench a distance away from the other jurors—does not support a conclusion under any standard of review that she was unable or unwilling to deliberate, had prejudged the case, refused to heed the court's instructions, or was otherwise unable to carry out her duties as a juror. This observation was an insufficient basis for the court to discharge her for failing to perform her duties as a juror.

Finally, Juror No. 3's defensiveness in questioning about her behavior in the jury deliberation room provides no ground for her removal. It was entirely predictable and understandable, as the court and defense counsel acknowledged, that Juror No. 3 would defend her actions and behavior to the court and counsel.

Our conclusion in this case is guided by *People v. Allen*, *supra*, 53 Cal.4th 60, where the California Supreme Court reversed the trial court's dismissal of a juror, Juror No. 11, who had reportedly made up his mind before deliberations commenced. When interviewed, other jurors were equivocal as to whether he made such statements.[2] The

---

2      When questioned by the trial court, Juror No. 11 said that he had not made up his mind and he had voted undecided during a preliminary vote on the fifth day of deliberations. (*People v. Allen*, *supra*, 53 Cal.4th at p. 74.) Another juror asserted that several times before deliberations began, Juror No. 11 had said he was waiting for the prosecutor to bring her case forward, but it never happened. (*Id.* at p. 66.) Juror No. 11 admitted having said more than once during deliberations that when the prosecution rested, it had not convinced him. (*Id.* at p. 68.) The juror who reported these statements to the trial court felt that Juror No. 11 was not being honest in denying that he had prejudged the case. (*Ibid.*) Yet another juror said that he or she suspected that Juror No.

21

high court said: "This record does not manifestly support [that the juror prejudged the case.] [¶] Although the record amply demonstrates that during deliberations Juror No. 11 did say words to the effect that, 'When the prosecution rested, she didn't have a case,' the precise meaning of his statement is not entirely clear. . . . . [¶] . . . [¶] . . . Juror No. 11's statement was made during deliberations, and only made reference to his previous state of mind at a single point during the trial. It did not indicate an intention to ignore the rest of the proceedings. The Attorney General has cited no case, and we have found none, in which a juror was discharged for prejudgment based solely on comments made during deliberations." (*Id*. at pp. 72-73.) The *Allen* court pointed out that the juror's remark was not an " 'unadorned statement' that he had conclusively prejudged the case. It did not establish that he had ignored further evidence, argument, instructions, or the views of other jurors. Although [Penal Code] section 1122 requires jurors not to form an opinion about the case until it has been submitted to them, '*it would be entirely unrealistic to expect jurors not to think about the case during the trial . . . .* ' [Citation.] *A juror who holds a preliminary view that a party's case is weak does not violate the court's instructions so long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations.* [¶] . . . *The record does not demonstrate that Juror No. 11 refused to listen to all of the evidence,*

11 began deliberations with his mind made up, but later had said, at the start of deliberations, that he was undecided. (*Id.* at p. 67.) Another juror said that Juror No. 11 said that he had his mind made up before deliberations began. (*Ibid.*) Another juror said the same thing, but added that Juror No. 11 then recanted his statement. (*Ibid.*)

*began deliberations with a closed mind, or declined to deliberate.*" (*Allen*, *supra*, 53 Cal.4th at p. 73, italics added.)

The court further pointed out that though the juror had a "strong opinion" about the case, he nevertheless was participating in jury discussions. (*People v. Allen*, *supra*, 53 Cal.4th at p. 54.) His conduct was consistent with what he had told the court: that he had not made up his mind before deliberations began, but "[t]he court here . . . implicitly rejected his denials of prejudging the case. Yet, the court made no findings that his 'undecided' vote and participation were somehow a sham or lacking in good faith. Moreover, the court did not ask Juror No. 11 what he meant by his statement. Nor did it attempt to resolve the matter with curative instructions." (*Id*. at p. 74.)

*Allen* found the trial court's approach deficient in that it relied on the opinions of many jurors whose stories differed, but found that the juror in question had " 'made it relatively clear to a majority of the jurors here that he . . . had his mind made up at the time . . . before the matter had been submitted to the jury.' " (*People v. Allen*, *supra*, 53 Cal.4th at p. 75.) This was held to be inconsistent with the record. (*Ibid*.)

Finally, the court stated: "*The reality that a juror may hold an opinion at the outset of deliberations is, as we have noted* [citation], *reflective of human nature. It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning. We cannot reasonably expect a juror to enter deliberations as a tabula rasa, only allowed to form ideas as conversations continue.* What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial

23

scrutiny before coming to a final determination.  [¶]  . . .  [¶]  *Certainly, a court may not discharge a juror merely because he or she harbors doubts about the prosecution's case.* [Citation.]  *That Juror No. 11 was unimpressed by the strength of the evidence and unpersuaded by his colleagues' assertions during deliberations does not amount to prejudgment.*  To conclude otherwise would . . . undermine the principle that both parties are entitled to the independent judgment of each individual juror." (*People v. Allen*, *supra*, 53 Cal.4th at pp. 75-76, italics added.)

Based on the foregoing, we cannot uphold the court's dismissal of Juror No. 3 during the jury's deliberations.  The record does not reflect that the court exercised "great caution" in reaching its decision to excuse a sitting juror (*People v. Allen*, *supra*, 53 Cal.4th at p. 71); the basis for her discharge does not appear on the record as a demonstrable reality; and the court's conclusion is not manifestly supported by the evidence on which the court relied.  (*Ibid.*)  All of these protections are important, as " '[t]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution.' " (*People v. Earp* (1999) 20 Cal.4th 826, 852; *In re Hamilton* (1999) 20 Cal.4th 273, 293 ["An accused has a constitutional right to a trial by an impartial jury."].)  Because Juror No. 3's conduct during or outside of deliberations does not establish either prejudgment or a refusal to deliberate under these standards, the trial court abused its discretion in discharging her from the jury.

24

## II. *Constitutionality of Evidence Code Section 1108*

In view of our disposition, we need not reach defendant's remaining challenges to the admission of propensity evidence and constitutionality of Evidence Code section 1108. (See *People v. Allen*, *supra*, 53 Cal.4th at p. 79.)

DISPOSITION

The judgment is reversed.

O'ROURKE, J.

I CONCUR:

McDONALD, J.

BENKE, J., Concurring.

The foreperson requested the court allow additional time for the jury to deliberate before dismissing Juror No. 3, who the foreperson stated was making progress in participation. I conclude the trial court should have granted the request. Therefore, I would reverse solely on the ground that the trial court prematurely dismissed Juror No. 3.


BENKE, Acting P. J.