[No. A132658. First Dist., Div. Three. Feb. 26, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCHE LAMONT HARRISON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Statement of Facts and parts 1. and 3. of the Discussion.

1374

**COUNSEL**

Barry M. Karl, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Sharon Wooden and Catherine McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

POLLAK, J.—A jury convicted defendant Marche Lamont Harrison of residential burglary (Pen. Code, § 459),[1] residential robbery (§§ 211, 212.5), forcible rape while acting in concert (§ 264.1), forcible oral copulation while acting in concert (§ 288a, subd. (d)), and being a felon in possession of a firearm (former § 12021, subd. (a)(1)). The court found defendant had one prior conviction for selling drugs (Health & Saf. Code, § 11352, subd. (a)) and two prior convictions for robbery (§ 211). The court sentenced defendant to 107 years to life in prison.

Defendant contends that an extended lapse of time between the filing of the complaint and his arrest violated his rights to due process and a speedy trial; that the trial court abused its discretion in replacing a deliberating juror with an alternate juror; and that the trial court erred in admitting certain expert

---

[1] All further section references are to the Penal Code except as noted.

testimony. We find no merit in these contentions and shall affirm the judgment. We shall publish only the portion of our opinion addressing the removal of a deliberating juror.

## STATEMENT OF FACTS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

1. *The time lapse between the filing of charges and defendant's arrest did not violate his rights to due process and a speedy trial.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *The trial court properly removed a deliberating juror who was unable to follow the law.*

The trial court removed a juror during deliberations upon concluding that the juror was unable to follow the law. (§ 1089.) Defendant contends the trial court abused its discretion and violated his state and federal constitutional right to trial by jury by dismissing the juror because the record does not establish to a demonstrable reality that the juror was unable to perform his duties. Although the replacement of a juror during the course of deliberations can be justified only under extreme circumstances, we shall set out in some detail the juror's behavior that demonstrates the patience and care with which the trial court proceeded. The court did not abuse its discretion when ultimately forced to conclude that the juror was unable to follow its instructions.

### A. *Jury deliberations and juror removal.*

Deliberations began on the afternoon of Tuesday, March 15, 2011. About two hours into deliberations the jury sent a note with questions and requests for materials, as follows: "Was there any evidence of DNA swabs from mouth of Jane Doe? [¶] Transcript and audio initial interviews w/ Jane Doe at hospital, 12/28/04; and initial interviews with Angela and Erica Doe, at police station. [¶] White binder from crime scene. [¶] Color photo of revolver, in Oakland residence. [¶] Transcript & audio of photo lineup session. [¶] DNA typing lab results. [¶] List of all prosecution and defense exhibit[]s." The jury then recessed for the day.

---

*See footnote, *ante,* page 1373.

The next day, Wednesday, March 16, the court conferred with counsel and then called the jury into the courtroom to respond in detail to each item in the note. Its response included an explanation that there was no evidence introduced at trial about DNA testing of oral swabs from Jane Doe and no DNA laboratory results apart from the expert's testimony, which upon request would be read back to the jury. The court also explained that only portions of the audiotaped witness interviews and the photo lineup session with Erica had been introduced as evidence and that those recordings could also be replayed in the courtroom upon request.

The jury resumed deliberations for a few minutes, then sent a note requesting all available audio recordings, the "entire" reporter's transcript and a "[t]imeline of case development: dates of actions taken by detectives, crime labs, searches conducted, samples taken, etc." The court arranged to have the recordings played for the jury and explained that the entire reporter's transcript would not be read but that portions would be read if the jury had specific questions. The court also explained that it could not create a timeline but that an individual juror was free to develop one from the juror's notes and recollection of the testimony.

Another note, previously typewritten at home by Juror No. 9, was presented to the court immediately after the morning recess on March 16. The note read: "Access to the computer has become an essential part of daily life. College students use laptops to take notes in class, sort through a multitude of concepts and ideas, do homework, draft papers, and revise papers. The students also have access to printers. [¶] It would be a serious handicap not to have access to the computer. [¶] In sorting through the facts of this case, the jurors may also need the help of a computer, say, merely for word-processing: [¶]-to establish the timeline [¶]-to note which exhibit establishes what fact, or raises what questions [¶]-to track the consistency or inconsistency in the same witness' testimony [¶]-to track the consistency and inconsistency among different witnesses and documents [¶]-to put down, in writing, the ideas that have come to the juror's mind, so that the ideas can be scrutinized (by himself or herself individually at first) more closely and more objectively at a later time [¶]-in light of the whole record, after reviewing all of the evidence [¶]-to track the questions in one's mind [¶]-to figure out which elements of crimes have, or have not, been proven [¶]-to organize, rethink, and revise all of the above in an efficient manner [¶]-Will a computer for word-processing be made available to the jurors? [¶] Will a LaserJet printer be made available to the jury? [¶] Can a juror use his or her own at home, under the condition that no one else will have access to the computer throughout the trial? [¶] Will a juror be permitted to bring his or her own LaserJet printer to the jury deliberation room?"

The court responded that a juror should not evaluate the case at home and that neither a computer nor printer would be provided in the jury room. The court encouraged the jurors to discuss the evidence together and to use a board in the jury room for outlining their points. The court explained: "This is a different process than maybe what you do when you're at work or if you're at school . . . . This is a deliberative process. Part of what the benefit of the jury is . . . you have 12 people sharing their ideas about . . . the evidence they heard and how the law would apply to the evidence. . . . [¶] . . . [I]f we could put all the facts in a computer and deliver an answer, we wouldn't need a jury. But that's not the process we engage in here. This is a process of . . . give and take where people talk to each other. They don't forego their opinions about the evidence but they listen to other people's opinions and they evaluate things in that fashion. [¶] . . . [I]t's different than a purely quantitative evaluation of everything. People are human beings. The jury is 12 human beings, thinking and talking about the evidence together. It's not such a mathematical process."

Following the court's explanation and the playing of the audiotape evidence, the jury resumed deliberations for only a few minutes before presenting another note. The note, written at Juror No. 9's request, asked for a definition of the word "abiding" and asked "is it possible for someone to come or stay to review the evidence on their own" apart from the other jurors. The court responded that individual review of the evidence when the jury was not assembled was not possible, and that no further definition of "abiding" would be provided apart from the instructions previously given. The jury then resumed deliberations for about two hours before the end of the day.

The next morning, Thursday, March 17, the jury foreperson sent a note to the court asking if the jurors could have extra copies of the instructions and take the instructions home. The foreperson also stated that "[o]ne juror is not comfortable with [the] process[,] causing others to feel they cannot proceed" and asked, "What is the process of using an alternate when a juror is causing conflict with [the] group?" The court provided each juror with a copy of the instructions, to be kept at court, and questioned the foreperson about the concerns expressed in the note concerning the deliberative process. The foreperson said a "particular juror," later identified as Juror No. 9, had questions about many words in the jury instructions and was "not open to discussion of the words or the definitions" but wants "to have formalized questions continuously submitted to the court" for further definition rather than looking "inside the instructions for definitions" or using "the common definition" of the word. The foreperson reported that Juror No. 9 was not comfortable with the jury instructions, "the process of coming to a conclusion, of analyzing circumstantial versus direct evidence" and that, as a result, other jurors felt that deliberations were not "a working process" and were

experiencing "spiked emotions." Out of the jury's presence, the court expressed to counsel its concern that Juror No. 9 was not "understanding the law." The court recalled the foreperson and asked him if "the dynamics of the deliberations" might change if additional words were defined or if the jury was advised by the court that certain words could not be further defined. The foreperson said it was possible but explained that Juror No. 9 was rereading "every single instruction" and struggling over many terms, including the meaning of "intent." The court remarked privately to counsel that it questioned if one is capable of serving on a jury if one "can't understand and apply the term 'intent.' "

The court, with counsel's consent, questioned Juror No. 9 to see if he was capable of proceeding. The court cautioned the juror not to disclose the substance of the deliberations and focused on whether the jury had everything it needed to deliberate. The court noted that the jurors had been given all trial exhibits for review and individual copies of the jury instructions and asked Juror No. 9 if he had "everything you need to deliberate" and discuss the charges with the other jurors. Juror No. 9 said he was "not at that stage yet." The juror said he was not ready to deliberate because he needed more time to study his notes and the jury instructions. The court asked Juror No. 9 if he would be ready to deliberate after further review of the jury instructions and he said "probably." The court asked if there were any words in the jury instructions that the juror felt were not sufficiently defined, and the juror said the problem with relying on the plain meaning of English words was that "everybody may not have the same understanding of the English words or interpretation" and "different people have different perceptions." The court said "that's part of the jury process," and Juror No. 9 said "it's not right, because the instruction about the law should come from the court" and wanted the jury to submit questions to the court when there were differing interpretations. The court asked if Juror No. 9 had been the one to request to stay late to review the evidence and he said that he had because he "was slow in reading English." Juror No. 9 was born abroad but had lived in the United States for "many years" and had a Ph.D. in physical chemistry from an American university. He said he had "taken a criminal law class" and had heard the terms contained in the jury instructions but found it "complicated" and wondered "for people who did not take such a class, how can they possibly understand instructions so quickly?" As an accommodation, the court offered to send the rest of the jurors home early and let Juror No. 9 stay to review his notes and the jury instructions that day and the following days when the jury was not scheduled to deliberate. Juror No. 9 accepted and said he "believed" he would be prepared to deliberate after doing so. The juror spent nine hours over several days alone in the jury room reviewing his notes and the jury instructions.

Deliberations resumed on the afternoon of Monday, March 21 and continued through Wednesday, March 23. On the morning of March 24, the foreperson sent a note to the court stating, "We the jury have not been able to reach a unanimous consensus on any of the charges at this time. [¶] It is the opinion of several jurors that one juror is having challenges with the concept[] of 'reasonable.' One juror, in particular, continues to discuss ideas from his personal experiences that were not presented in this case as evidence nor are they relevant to the case before us. [¶] This has caused conflict within the group of jurors and elevated tempers to the point that the group will not be able to reach agreement on the charges before us. [¶] At this time we would either require an alternate juror or move towards a hung jury verdict."

Juror No. 9 wrote a reply note saying he disagreed with the foreperson's statement and thought deliberations should continue. Juror No. 9 said, "The jury instruction calls for us to rely on common sense and experience. Relying in part on my experience in life, I feel that on the basis of the evidence as presented . . . I do not believe that the prosecution has sufficiently proven the allegations to allow me to form an abiding conviction about the guilt alleged."

The court called the jury into the courtroom. The court first addressed the foreperson's note about the inability to reach a consensus. The foreperson said the jury had discussions and preliminary votes on six of the seven charges and had cast ballots on a couple of charges. The vote on the last ballot was 11 to one. The court asked the foreperson, then Juror No. 9, if there was any legal clarification the court could provide to assist the jury in reaching a verdict. Juror No. 9 said, "I don't know what to ask for except for understanding of the Constitution or the jury instruction, because people have different interpretations." The court asked if he had a specific question and, after further exchange, Juror No. 9 noted that the juror questionnaire said a juror "must follow the law regardless whether you believe in it or not. And, I mean, at that time I hesitated and but then I—there is something I don't agree with, I mean, then why does [the] Constitution require us to follow something we don't believe in? [¶] So this may be a question in everybody's mind, and it's so—so why is the standard set so high that defendant is—should be presumed innocent? And why can't we apply the lower standard of proof such as preponderance of the evidence?" The court asked Juror No. 9 to write a note with his legal questions so court and counsel could confer about a possible response, and declared a long lunch recess.

Juror No. 9 wrote five pages of questions. The numerous questions included the following: "Why is there a difference in the standard of proof between civil trials and criminal law?"; "Does it make sense that a defendant may be found not guilty in a criminal trial, but guilty in a civil trial (based on

the same facts)?"; "When I have reasonable doubt, how do I tell that my doubt has risen only to the level of preponderance of the evidence, but has not reached the level of beyond a reasonable doubt (for sure ?)"; "Why must we pledge that we must follow the law even when the law is itself in dispute in court?"; "Why must a defendant be presumed innocent?"; "Why is defense not required to present any evidence, or to call any witness?"; "Does the fact that an evidence has been admitted by the court into evidence mean that the court has determined that the evidence is reliable?"; "When a witness gives contradictory testimony, I am at a loss as to how to determine, objectively, which testimony I should believe"; "What constitutes juror misconduct requiring disqualification, mistrial, or new trial?"; "What if a juror suddenly realizes that the juror can no longer be impartial?"

The court conferred with counsel. The prosecutor questioned the juror's "readiness" to serve as a juror and said Juror No. 9's note posed many questions that were of "a broad ranging nature" "far beyond the purview of a juror." Defense counsel objected to removing Juror No. 9 from the jury but said the court should not "endeavor to answer the questions" because the "contents of the questions divulge" the "deliberative process of the jury." The court expressed doubts that Juror No. 9 was following the law and decided to examine him further.

Juror No. 9 said that some of the questions he posed referred to other jurors, not himself, including the question asking what happens if a juror "can no longer be impartial." Outside of the jurors' presence, defense counsel argued that Juror No. 9's note was "essentially describing the deliberative process" and that no further inquiry or action was necessary. The prosecutor disagreed, arguing that the juror's written questions went "far beyond what was put to him by the court this morning" and demonstrate that Juror No. 9's mind was ranging beyond "the issues placed before the jury in this trial."

The court concluded that Juror No. 9 was not following the law. The court found that Juror No. 9 was "considering things that he's been told not to consider," asking, for example, why the defense is not required to present any evidence or call any witnesses. The court observed that, from the outset of trial, "the court has admonished the jurors that that's the constitutional protection that the defendant is entitled to, and the fact that he's raising that after four days of deliberation indicates to the court that he's not following the law." The court also noted that Juror No. 9 questioned why a defendant is presumed innocent, despite clear instructions to that effect, and is "considering why there's a different standard of proof in civil versus criminal" trials. The court said Juror No. 9 was not "following the law that the court has instructed him on or following the court's directions as to what he's supposed to deal with here. . . . [¶] . . . [H]e's clearly getting way beyond the scope"

and "engages in flights of legal fancy," "speculating on things that are far beyond the record." The court also noted that Juror No. 9 expressed an inability to judge credibility in writing in his note that he was "at a loss as to how to determine" which testimony to believe. The court found Juror No. 9 "incapable of executing his obligations as a juror in a fair and impartial manner," removed him from the jury and seated an alternate juror in his place.

Jury deliberations began anew on the afternoon of Thursday, March 24. The jury deliberated for the rest of that day and recessed until Monday, March 28. The jury reached a verdict on the afternoon of March 28. The jury found defendant guilty of five counts and not guilty of two counts.

### B. *The court did not abuse its discretion.*

██ " 'The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. (§ 1089.) "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]" [Citation.] . . . "Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists." ' " (*People v. Homick* (2012) 55 Cal.4th 816, 898 [150 Cal.Rptr.3d 1, 289 P.3d 791].)

██ "Great caution is required in deciding to excuse a sitting juror" (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 [133 Cal.Rptr.3d 548, 264 P.3d 336]) especially where, as here, a lone holdout juror is excused.[7] "A court's intervention may upset the delicate balance of deliberations. The requirement of a unanimous criminal verdict is an important safeguard, long recognized in American jurisprudence. This safeguard rests on the premise that each individual juror must exercise his or her own judgment in evaluating the case. The fact that other jurors may disagree with a panel member's conclusions, or find disagreement frustrating, does not necessarily establish misconduct." (*Allen and Johnson*, at p. 71.) But removal of a holdout juror is proper where the facts demonstrate the juror is unable to follow the law. (*People v. Alexander* (2010) 49 Cal.4th 846, 928 [113 Cal.Rptr.3d 190, 235 P.3d 873].) A "trial court's attempt to ensure the jurors understood the

---

[7] Despite the court's admonitions not to disclose his deliberative process, Juror No. 9 revealed in a note to the court that he did not believe "that the prosecution has sufficiently proven the allegations to allow me to form an abiding conviction about the guilt alleged." The court later learned that the numerical division of the deadlocked jury was 11 to one. Contrary to defendant's claim, the court did not err by inquiring into the jury's numerical division. (*People v. Homick, supra,* 55 Cal.4th at p. 901.)

law," and removal of a holdout juror who would not or could not follow the law, "cannot be viewed as an improper attempt to overcome a deadlock in the jury's deliberations." (*Ibid.*)

"While removal of a juror is committed to the discretion of the trial court, upon review, the juror's disqualification must appear on the record as a demonstrable reality. 'The demonstrable reality·test entails a more comprehensive and less deferential review' than substantial evidence review. 'It requires a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that bias [or other good cause for removal] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' " (*People v. Homick, supra,* 55 Cal.4th at p. 899, some italics omitted.)

█ The trial court's conclusion that Juror No. 9 was not following the law is well supported by the record set out in detail above. Defendant argues that Juror No. 9 "was very conscientious and hardworking." That appears to be true, but despite his best efforts, the juror manifestly was unable to focus on the relevant principles and to apply the court's instructions to the facts of the case before him. The juror appears to have been overwhelmed by the task of a juror, questioning the basic principles he was instructed to accept, such as the presumption of innocence, and the meaning of many commonly used words in the court's instructions. It is true, as defendant points out, that Juror No. 9 told the court that some of the questions he posed were "raised by the other jurors," but there is no other indication that any other juror was having any difficulty in understanding or following the court's instructions. In all events, most of the questions posed by Juror No. 9 clearly related his own deep uncertainties and inability to follow the court's instructions. He asked, "When I have reasonable doubt, how do I tell that my doubt has risen only to the level of preponderance of the evidence, but has not reached the level of beyond a reasonable doubt (for sure?)." He acknowledged, "When a witness gives contradictory testimony, I am at a loss as to how to determine, objectively, which testimony I should believe."

Juror No. 9's questions went far beyond issues relevant to the case. He asked: "Why must we pledge that we must follow the law even when the law is itself in dispute in court?," which he explained referred to conflicts between federal and state courts. The juror was unable to concentrate his attention on relevant legal matters despite accommodations and assistance by the trial court, including hours of independent study of jury instructions and trial notes. The trial court rightly concluded that Juror No. 9 went "way

beyond the scope" of the trial as he "speculat[ed] on things that are far beyond the record" and was unable to follow the law applicable to the case.

 Defendant argues that the trial court erred in limiting its investigation to Juror No. 9 without inquiring into possible misconduct by other jurors. Defendant contends that evidence of misconduct was embedded in Juror No. 9's five pages of questions, and in the question, "What if a juror suddenly realizes that the juror can no longer be impartial?," which he said referred to "other persons." As our high court has observed, "A trial court made aware of the possibility of a juror's misconduct, and particularly possible misconduct occurring during the jury's deliberations, is placed on a course that is fraught with the risk of reversible error at each fork in the road. [Citation.] The court must first decide whether the information before the court warrants any investigation into the matter. [Citation.] If some inquiry is called for, the trial court must take care not to conduct an investigation that is too cursory [citation], but the court also must not intrude too deeply into the jury's deliberative process in order to avoid invading the sanctity of the deliberations or creating a coercive effect on those deliberations [citation]. After having completed an adequate (but not overly invasive) inquiry into the misconduct issue, the trial court must then decide whether, under section 1089, there is 'good cause' to excuse the juror at issue. The court at this final fork might err in declining to dismiss a juror who should have been excused [citation] or excusing a juror who should have been retained [citation]. In making these decisions, a trial court might at times be placed between a rock and a hard place . . . ." (*People v. Fuiava* (2012) 53 Cal.4th 622, 710–711 [137 Cal.Rptr.3d 147, 269 P.3d 568], fn. omitted.)

 The trial court here navigated this difficult course well and did not abuse its discretion by limiting its investigation to Juror No. 9. The information provided by Juror No. 9 did not warrant inquiry into the conduct of the other jurors. His general question about juror impartiality indicated, at most, that he believed other jurors were not impartial. Such feelings are not uncommon during heated deliberations and here the juror provided no reason to believe other jurors were not impartial. The expression of such a sentiment without any evidence of juror bias does not compel further investigation. Nor was investigation of other jurors compelled by the suggestion that evidentiary issues such as the reliability of admitted evidence and the burden of proof were "raised" during discussions among the jurors. These matters were proper subjects of jury deliberation. There is no evidence that the other jurors were not following the law on these subjects. The court acted properly here in limiting the scope of its inquiry and not delving into the content of the jury's deliberations. A trial court must take care " 'to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.' " (*People v. Thompson* (2010) 49 Cal.4th 79, 137 [109 Cal.Rptr.3d 549, 231 P.3d 289].)

3. *Expert testimony based on a hypothetical question was properly admitted and in all events was not prejudicial.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Jenkins, J., concurred.

A petition for a rehearing was denied March 15, 2013, and the appellant's petition for review by the Supreme Court was denied May 22, 2013, S209627.

---

\*See footnote, *ante*, page 1373.