Filed 3/28/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PABLO SALINAS-JACOBO,<br><br>        Defendant and Appellant. | A152729<br><br>(Sonoma County<br>Super. Ct. No. SCR673522) |

When a jury foreperson in a criminal trial discloses the jury has reached a verdict on some counts but has not been able to reach a verdict on others, a trial court must tread very carefully before it discharges a juror for failing to perform his or her duties under Penal Code section 1089. At stake is a defendant's right to due process and a fair trial by an unbiased jury, and we review a trial court's decision to discharge a juror in this circumstance under a "demonstrable reality" test, requiring a showing that the trial court "*did* rely on evidence, that in light of the entire record, supports its conclusions" that a juror was actually unable to perform. (*People v. Armstrong* (2016) 1 Cal.5th 432, 450-451 (*Armstrong*).) In this appeal, based on questioning of three jurors, including the juror who was eventually discharged, the trial court discharged a juror for considering evidence outside the record, considering punishment, and not following the jury instructions. We conclude that these failures to perform the juror's duty were not shown as a demonstrable reality, and we reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Collision

On the afternoon of November 8, 2015, defendant Pablo Salinas-Jacobo's red Ford Mustang collided with a Chevy Traverse and a Dodge Charger near the driveway to the

1

Merriam Winery on Los Amigos Road in Sonoma. The passenger in the Dodge Charger died four days later from injuries sustained in the crash, and the driver suffered a severe shoulder injury. The passenger in the Chevy Traverse developed a stiff neck and shoulders, and had headaches for the next two or three months.

A California Highway Patrol officer evaluated the driver of the Dodge Charger for signs of intoxication and found none. Not so with defendant, who admitted he had drunk a "cup of bourbon." He claimed that someone had "cut me off." Defendant showed signs of intoxication, and a preliminary alcohol screening test showed his blood alcohol content (BAC) was 0.183 and 0.171. A blood draw shortly more than two hours after the collision showed a BAC of 0.185.

The Charges

Defendant was charged in a five-count information with murder (Pen. Code, § 187 – count 1), gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) – count 2), driving under the influence of alcohol (DUI) causing injury (Veh. Code, § 23153, subd. (a) – count 3), driving with a BAC of 0.08 percent or more causing injury (Veh. Code, § 23153, subd. (b) – count 4), and driving with his driving privilege suspended due to a prior DUI conviction, having previously been convicted of the same offense (Veh. Code, § 14601.2, subds. (a) & (d)(2) – count 5). As to the DUI charges in counts 3 and 4, the district attorney sought enhancements for bodily injury (Pen. Code, § 12022.7, subds. (a) & (b)) and excessive BAC (Veh. Code, §§ 23558, 23578). The vehicular manslaughter (count 2) and the DUI charges further alleged that defendant had suffered two prior DUI convictions.

The Trial

There were more than 30 witnesses and 70 exhibits over the course of a more than two-week trial.

According to an expert in accident reconstruction and investigation, the Dodge Charger was traveling southbound in the southbound lane of Los Amigos Road, with the red Ford Mustang traveling behind it. The Dodge Charger slowed in the last five seconds before the crash to make a left hand turn into the winery driveway. At the same time, the

2

Chevy Traverse was preparing to make a right turn from the winery driveway, into the northbound lane of Los Amigos Road. As this was happening, the red Mustang moved into the northbound lane in an attempt to drive around the Dodge Charger before it made its turn. The Dodge Charger began its left turn as the Chevy Traverse made its right turn, and the Ford Mustang collided with the Chevy Traverse and broadsided the Dodge Charger. After the impact, the Dodge Charger spun and traveled about 75 feet south; the Mustang traveled 55 feet and stopped in the southbound lane.

The Dodge Charger had an electronic data recorder (EDR) which records data at the time of a collision, and another expert testified on interpretation and retrieval of such electronically stored data. The Dodge Charger's EDR showed that about five seconds before the collision, it was traveling at about 28 miles per hour, and then slowed to about eight miles per hour as it turned left into the driveway of the winery. The EDR did not show whether the Charger's left-turn signal was activated at the time.

A criminalist testified that, extrapolating from defendant's blood test results, defendant's BAC at the time of the crash was between 0.221 and 0.225 percent, and that defendant would have had to consume a minimum of 9.7 drinks to reach a 0.225 BAC.

Two witnesses testified that they had seen a red Ford Mustang driving recklessly shortly before the fatal collision.

Defendant did not testify.

Jury Deliberations

*March 28*

The jury began deliberations in the late afternoon on March 27. The next day at 2:50 p.m., the foreperson sent the judge a note. Among other things, he asked: "We have a juror who is difficult to reason with and are having trouble with our discussions. Do you have any suggestions? We were thinking a check-in to remind us of our duty and what we are allowed to consider as evidence would be helpful."

The trial court called the jury back to the courtroom to respond to two substantive questions, and then referred the jurors to CALCRIM No. 200 (duties of judge and jury), CALCRIM No. 222 (evidence), and CALCRIM No. 3550 (the predeliberation

3

instruction). The court reread the second and third paragraphs from CALCRIM No. 3550 which instruct that it is "your duty to talk with one another and to deliberate," and encourage jurors to "[k]eep an open mind and openly exchange your thoughts about this case."

*March 29*

The next day, the jury foreperson sent the court another note at 3:30 p.m. indicating the jury had reached a verdict on counts 3, 4, and 5 but could not "come to a consensus" on counts 1 and 2. The trial court called the jury back to the courtroom again and then read CALCRIM No. 3551, describing it as an additional instruction that would provide the jury "some information for you to consider and for you to proceed at this time."

At the end of the day's deliberations, with the entire jury present, the trial court asked whether the jury had reached a verdict on all counts, and the foreperson responded, "I, based on our current deliberations and conversations, see a very difficult road to reaching consensus."

*April 3*

The next day of deliberation at 11:30 a.m. the foreperson wrote a note stating the jury was deadlocked 11-1 on count 2, "we do not see a way forward," and "[f]rustrations are running high." The foreperson wrote a second note at 11:45 a.m, this one headed "Personal Note," and stating, "I do not feel the dissenting juror is basing their dissent on reasonable doubt and is having trouble stating their side other than 'I have to consider the whole picture, and to me there is a doubt.' We have tried to describe responsibility & process and the requirements of a juror, but have made no progress for 2 days."

The court discussed the notes with counsel, observing that the jury had been deliberating for two full days, plus two hours that morning. The trial court brought the foreperson into the courtroom for questioning. The foreperson reported that all the jurors had had an opportunity to express their views and that no juror had refused to participate in the discussion or deliberations. The jury had taken "probably five" votes on the charges. Regarding his "Personal Note," the foreperson said his intent was "to try and

4

convey in a short amount of words what I believe has been a very solid good faith amount of effort by all members of the jury, the majority, and the minor [*sic*] on each of the, you know, decisions we are trying to come to. But what the frustration and the tension there is that we do not seem to be able to come to a consensus. [¶] And I commend all the members of the jury, because it has been a very invested and involved process by all of them, and we are very frustrated that we can't come to an agreement. And I do not see a reasonable way forward to break that deadlock."

The trial court asked whether any member of the jury stated that they were refusing to follow the law. The foreperson responded no.

The trial court then had the entire jury brought into the courtroom. The foreperson did not believe further deliberations, instruction from the court, or read back of testimony would assist the jury. Nor did the foreperson think it would be useful for each attorney to make brief additional closing arguments. No member of the jury indicated any of these additional steps would be helpful.[1]

The jury returned three guilty verdicts, and the verdicts were read by the clerk. But then it was discovered that the verdict forms with the appropriate enhancement allegations had not been given to the jury, so the jurors' verdicts had not addressed the enhancements. Outside the presence of the jury, the trial court told counsel it wanted the jurors to complete the proper verdict forms on counts 3, 4, and 5, and then it intended to declare a mistrial and deadlock on counts 1 and 2. The trial court gave the jury the appropriate verdict forms for counts 3, 4, and 5, explained the new verdict forms, and sent the jury back to deliberate.

At 3:40 p.m. the foreperson sent a note asking to "discuss the particulars of the deliberation" with the trial court, and elaborating, "I have concern with this process. One juror and I would like to speak with you." The court responded, "at this time, I will not speak with you or another juror individually."

---

[1] The foreperson also reported that about four votes had been taken on count 2 (vehicular manslaughter), and three or four votes on count 1 (murder). The vote on count 1 was 10 to 2; on count 2 the most recent vote was 11 to 1.

5

At 4:25 p.m., the foreperson sent in another note, stating that the jury was unanimous on one enhancement. The note went on, "We cannot come to agreement on the remaining enhancement. [¶] There is not a chance of reaching agreement unless you discuss with individual jurors."

After consulting with counsel, the trial court brought the jury into the courtroom. The foreperson said there was a unanimous decision on one enhancement. Again, the trial court asked whether it could assist the jury. The foreperson replied, "I would like to get detailed in the conflict we're having, but without getting into details I do not feel like anything that you mentioned would be of any use in getting us to a unanimous decision." The court inquired whether the conflict was "concerning the law and an instruction on the law." The foreperson responded, "It's concerning what we as individual jurors are allowed to consider or not consider and how broad a scope—what is reasonable doubt and what is unreasonable doubt. What is, when looking at an enhancement, whether or not you can question or not question your decisions. It is becoming unfruitful to continue to deliberate."

The trial court responded that the scope of what jurors could consider was addressed in detail in the jury instructions. The trial court asked the 12 jurors as a group whether there was anything that would assist them. Juror 10 responded, "I think we are having an issue with understanding our legal responsibility as a juror. How we are to apply law and the evidence that has been provided and to make a decision. From my standpoint I think that not all of us are understanding how we should be applying the law and how we should be making decisions, which I'm not sure if this Court is even able to clarify that for us. [¶] Reading the instruction for us has not helped, and I would ask that you have a separate conversation perhaps where our foreman can be more frank with what the real problem is."

*Questioning of Foreperson*

After conferring again with counsel, the trial court asked the foreperson to remain in the courtroom. With counsel and defendant present, the trial court asked him "what you believe, from your perspective, the issue is." The foreperson responded, "The issue,

6

as I perceive it, is we have a juror [later identified as Juror 11] who, from my perspective, is not willing to perform their role as a juror. And I see the role as taking facts, applying the facts to the law and making a judgment whether they have reasonable doubt or unreasonable doubt as to a guilty or innocent verdict. [¶] And I feel personally that one juror is applying different standards based on what charge they're considering and cannot justify to the rest of the group where and how they come to these standards that they call 'higher standards.' [¶] That they are espousing positions that are cognitively dissonant. They can't think one thing and another thing are true at the same time, and so I can get more specific if you would like, but if we as a group have voted unanimously that someone is guilty of causing the injury and then—and a very clear but separate subsection is that great bodily injury or not, and they decide that they can't answer that question because now things are unclear to them and they don't want to take the specific question that the law is asking and answer that specific question. They want to then relitigate their concerns about the whole case.

"And so we are approaching it in as many avenues as we can, and ways we can, and I believe we have entered into the adversarial phase now where it feels like we're picking on this juror because we're trying to reason in what—I've tried to mitigate or manage discussions as a thoughtful and open and fair communication, and I think we've done an okay job there, but the juror is having a very hard time explaining where their reasonable doubt is coming from and pointing to the facts that are giving them reasonable doubt.

"And the concerning things to me and why we've continued to push in there is because it feels like they want to say I'm entitled to my opinion and I can hang a jury because I feel like it, and I don't believe that is the role of a juror and I don't believe that that is an appropriate way to approach our job in there. So I have expressed that verbally to them, other jurors have also expressed that verbally.

"So, it feels like when we bring these remaining charges or enhancements that their reluctance to make what I feel is a smaller technical decision on these enhancements

7

is related to two days of arguing on a more general topic, and I—and we as a jury have tried and I don't see a way to get past this."

The trial court then asked a series of questions, which we restate almost verbatim:

"THE COURT: . . .You've used a phrase that one of the jurors had used the term that they're going to follow higher standards and not the law. From your perspective, has one of the jurors either by specific words or by statements led you to conclude that they're not following the law?

"[FOREPERSON]: That was not the specific words to indicate that but, yes, by general statements and by the way they are arguing their position, yes.

"THE COURT: Did one of the jurors state they are not going to follow the Court's instruction but they will follow a higher standard?

"[FOREPERSON]: They didn't say they won't follow the Court's instructions, but in repeated conversations they continue to say I need to apply different standards when you ask the question one way, and that now I have to take into consideration other factors because now this is more serious and they can't clearly articulate what they mean.

"THE COURT: Now you've also used the term from your perspective the juror has stated or has engaged in a reluctance to decide. Have any of the jurors refused to vote on any of the ballots?

"[FOREPERSON]: [Juror 11] is refusing to vote and then when pressed and then would reluctantly make a decision.

"THE COURT: So they did ultimately vote?

"[FOREPERSON]: Correct."

The jury was called back, the trial court told them he might speak to some of them individually the next morning, and the jury was excused for the day.

*April 4*

The next court day outside the presence of the jury, the trial court told counsel it intended to ask Juror 10 questions similar to those the court asked the foreperson, and then question Juror 11. The court stated there was no substantial evidence of juror misconduct but there was "enough to follow up on."

8

*Questioning of Juror 10*

Following a few general questions about the juror's "observations during the process of deliberations," Juror 10 confirmed that no juror stated they were going to consider the issue of punishment. The trial court asked whether any member of the jury stated "that they were not willing to follow the law as I had instructed the jury." This discussion followed:

"[JUROR 10]: Not in those words.

"THE COURT: Well, are there any words that were used by a juror that led you to believe and conclude that one or more of the jurors were not willing to follow the law?

"[JUROR 10]: Yes. . . .

"[JUROR 10]: One of the jurors said that, if they were to strictly follow the law, that they would be able to convict; but, because we were jurors, we're peers, and that's why we were selected as jurors; and we're not lawyers— [¶] . . . [¶] But that he was unable to do so. And he indicated that, because, that we should be—I'm going to stop right there, actually." Juror 10 attributed these statements to Juror 11.

The trial court urged Juror 10 to continue, which the juror did: "But he was unable to do so, because he felt that our jobs as jurors was not to just strictly apply the law, but that we were to consider, we had other considerations to make as well. And one of those was that he felt that there needs to be, he had a higher standard to hold the prosecution on charges that were above injury. [¶] For instance, he's unwilling to—he stated that he was holding a higher standard for the defendant when you brought in bodily injury, great bodily injury." In response to another question, Juror 10 stated that "I believe that Juror Number 11 believes that his interpretation of following the law is following the law."

Juror 10 told the court Juror 11 had used that phrase "if he were to strictly follow the law, he would convict, but—" twice. The first time was "a couple days ago" "in reference to trying to explain his reasoning behind why he was, where his reasonable doubt came from."

9

In response to further questioning, Juror 10 reported Juror 11 saying that "our jobs were not only to follow the law, because we were a jury of peers, and if we were to strictly follow only the law, we would be doing so in the capacity of being lawyers, which we are not; so there are other things to consider, like fault. Like responsibility of the other parties involved. That there was an accident occurred, more than one person was involved, so we cannot hold one person solely responsible in a manner such as like a scapegoat."

The court asked whether any juror had said they were going to consider "something other than the evidence that was received," and Juror 10 said this about Juror 11: "[B]ecause there was no evidence of a blinker or an indicator, that he felt that that was evidence in itself; and from the explanations of the witnesses, he has come up with an entirely different scenario based off of, I'm not sure what, of what happened. And he used that as, I feel he's using that as evidence as to why he cannot—as to why his decisions are as they are."

Juror 10 also reported that Juror 11 said he "holds a different standard for burden of proof for any charge that is greater than for a [*sic*] injury, and that he would need to, in order to give a verdict of guilty for a charge of, above causing harm, he would need proof beyond a reasonable doubt that the other party had over 110 percent known, did everything perfectly."

*Questioning of Juror 11*

The trial court then brought Juror 11 to the courtroom for questioning, asking for his "observations and perspective about the deliberations." Juror 11 confirmed that all jurors had been participating in discussing the case and that no jurors had refused to deliberate on the questions before the jury.

Asked whether any juror had said they were considering punishment in their deliberations, Juror 11 answered, "[u]nfortunately, yes." He continued, "But it came about like . . . how could you let somebody go that's like that. . . . I think the victim is not getting, you know, the right justification here. And that type of thing. Which I thought was your responsibility, Honorable Judge. The punishment part of it. Ours is just to

10

decide if, according to the law and charges, you know, the accused [is] guilty or not guilty. That's all we should do there. But I felt absolutely that the discussion really turned to that level, which I did not feel comfortable."

Asked to clarify whether potential punishment was being discussed or the impact of the case on the victims, Juror 11 responded, "Both, as a matter of fact, because it is kind of associated. If we let the accused go unpunished, the victim don't get the just [*sic*] there." Asked to clarify further whether any juror discussed the punishment the defendant might receive, Juror 11 responded, "Not specific punishment as such; but in general, the punishment . . . . What is the outcome of it if we let go somebody free. But not any specific punishment that, you know, this count is going to provide . . . ."

Juror 11 told the court he had not considered and discussed the punishment the defendant might receive as a result of the jury's verdict.

When asked whether Juror 11 heard any member of the jury state they were not going to follow the law as instructed by the judge, Juror 11 stated, "Not outright, no." Juror 11 also answered that no one, including him, ever made that statement.

The court then asked whether anyone (including Juror 11) ever stated that they were going to apply a different burden of proof other than as instructed by the court. Juror 11 responded, "This thing was raised as an issue during deliberation; that, for one and same charges, when it is elaborated, for certain counts, you're using one set of rules, and then you're looking to, into more details. But that was I think part of the deliberation process."

The trial court asked, "Did you ever use the phrase that you are going to follow a higher standard? Did you personally ever use that phrase?" Juror 11 answered, "No. But it was mentioned by others." When the trial court asked which jurors used the phrase "higher standard," Juror 11 replied that it came from "different" jurors and he couldn't specify one single juror.

The trial court asked whether Juror 11 had ever stated during deliberations, "if you were to strictly follow the law, you would find the defendant guilty on all charges?" Juror 11 replied, "Not that I could recall. No." The court then asked the question again,

11

"At any point during the deliberations, did you ever use the phrase that, if you were to strictly follow the law, you would find the defendant guilty on the charges, but that you have, and the jury has a different duty, and you were going to follow a different standard other than following the law?" Juror 11 said no.

The trial court continued, "At any point in time during the deliberations, did you ever hear any juror use the phrase, 'our job is different than described by the Court, and our job as jurors is to follow a higher standard'? Did you ever hear that phrase?" Juror 11 again said no.

The court asked, "Did you ever hear any member of the jury use the phrase that, with regard to the enhancements, and the level of injury, that, if the jury were discussing a more serious injury to any of the three victims, that, if it's a more serious injury, the jury has to use a different standard in reviewing that injury?" The juror answered, "Yes, I heard them." Juror 11 went on to state that "[e]ssentially I made that statement. And I said that . . . this is a serious charge. We need to look into the whole picture, rather than, you know, saying it's a simple thing. But look into all the evidences [*sic*], and eliminate all the potential, you know, doubts here. Just because it's a serious case here."

Juror 11 denied stating he "felt that the jury would have to be 110 percent sure" before they could find the prosecution met its burden of proof and denied hearing anyone else refer to "110 percent sure."

When the trial court asked whether anyone said the jury would have to be "100 percent sure on any of the charges before they could find the People have met their burden of beyond a reasonable doubt," Juror 11 responded, "In that line, but not the way you're saying that 100 percent. Like you know, we have to be sure that there is no reasonable doubt. But the word 100 percent as you were mentioning, not like that."

Then the trial court turned to whether any juror had stated they are "considering other information or other evidence aside from the evidence" received in the trial. Juror 11 said no. When the trial court pressed further with whether Juror 11 himself had ever stated that "even though the evidence wasn't received here in court, [you] believe there was evidence of other facts" that he was going to consider, he still said no.

Then the trial court drilled down to specific pieces of evidence, asking whether Juror 11 ever made a "statement with regard to whether you believed there was any evidence or lack of evidence of a blinker being used, a turn signal being used by any driver in this case." This discussion about jury deliberations ensued:

"[JUROR 11]: It, I did question in that line, but maybe not exactly what you're saying. The question was raised.

"THE COURT: Well, whether you said it in jury deliberations or not, did you ever, yourself, consider information, facts, or what I might describe, well, information or facts that were not presented as evidence in this case?

"[JUROR 11]: If I talk in terms of blinkers, yes. Because I, I raised the issue, was the blinker on? Type of thing. Because I think I saw in some instruction that that is one of the things that you should consider also."

Then the court moved on to whether Juror 11 was following the law, asking whether he had followed "any concept of law other than what I have instructed you on." Juror 11 firmly denied this ("No, I followed your instruction") and the follow-up question on whether he had applied a different definition of reasonable doubt ("No").

The final question to Juror 11 was whether he had ever made the statement that "because the members of the jury are not attorneys, that they have a different job and a different role to play other than the role that I have defined for jurors in this case." Juror 11 answered no.

*Second Questioning of Foreperson*

The trial court questioned the foreperson some more. The trial court asked whether the foreperson had heard any juror state "if they were to strictly follow the law, that they would be able to convict." The foreperson attributed this statement to Juror 11. The trial court followed up and asked whether Juror 11 "further state[d]" that he was "unable" to convict because "he felt your job as jurors was not to strictly apply the law? Did you hear Juror Number 11 make a statement, that statement, or a statement that's the same or similar?" The foreperson answered, "I believe he said something to the effect that, we, something to that effect that, sure, everyone, if we just go by the facts, it's easy,

13

we can convict on all the counts. But we are jurors, and we are his peers, and it is our job to look at more than that. We have to take everything into consideration, and then it's not so easy, and things to the effect. Where we as a group tried to focus on the first part of that sentence, to let him understand how we thought he was presenting himself. But yes, he did make statements on multiple occasions, because we were rehashing the same ground multiple times."

The court asked whether Juror 11 ever stated what more information should be considered other than the facts. The foreperson replied, "He did, but it tended to vary based on which point we were discussing. But he was indicating he didn't like the way investigations were done, and he would have done it differently, and he was indicating that he thinks your responsibility for driving safely goes up or down whether or not you have a passenger in the car, and that that was somehow affecting how you would decide a, you know, one of the points we were considering. He continued to be very convinced that because multiple vehicles were involved, that he could not assign blame to anyone, and was very concerned that the, specific act of assigning a guilty verdict would absolve other people that he thought should have responsibility in a matter. [¶] He continued to try to introduce new scenarios that were not introduced by the prosecution, the defense or any of the witnesses, about the behavior of the vehicles on the road, and continued to insist that because we didn't have blinker information on the [EDR's], that the [EDR's] were not complete, and he was upset that we didn't have information about whether blinkers were on. [¶] There are probably more, but that's much as I can remember right now."

Then the trial court turned to the question of whether any juror discussed the issue of punishment. The foreperson replied that "Juror Number 11 brought it up, and it was, it may have been mentioned once or twice; but each time somebody started to make that mention, the group would very quickly remind everyone that, you know, we are not allowed to discuss punishment, and that is not to be part of our consideration."

The court then asked about whether any juror stated they were going to apply a different burden of proof than instructed by the court. The foreperson replied: "From my

14

perspective, their statements directly said it and continued to imply it; but during these conversations, it would start out saying— [referring to Juror 11], 'We have to look at all of,' you know, 'We have to look at everything.' And 'For me, it's, it has to be more serious,' or "I have higher standards.' And then as soon as we would press him, to say, 'You can't hold anything to different standards than what the law allows,' he would immediately say, 'Yes, yes, and it's reasonable doubt, because I have reasonable doubt.' " [¶] So he realized that his statements, after we pointed it out to him, were possibly either misstating his intent, or not legal; and then would, in the same series of arguments, go back to, 'It's my reasonable doubt, and I am allowed to have that.' [¶] And so our actions in the jury room were to encourage him to explain his reasonable doubt, and to explain which parts of the facts and the law were creating that for him. And he could never do that specifically."

In response to a question, the foreperson also reported, ". . . Juror Number 11, you know, said something to the effect that we have to eliminate all possible doubt. And personally, I feel he is trying very hard to justify a position that he wants to take morally and consciously, but not a position that is supported by the facts. And during the statements, the rest of the room hears that language and immediately knows that it is incorrect; and so, at those times, when things like that are uttered, objections are raised from the rest of the jurors, and the statement is woven into something that sounds more like, 'Yes, yes, what I mean is reasonable doubt, reasonable doubt.' And so—but things to that nature have been said over the course of the days."

The foreperson never heard any member of the jury talking in terms of percentages, that they had to be 100 or 110 percent sure before delivering a verdict.

Juror 11 Is Discharged

The court announced its tentative decision to remove Juror 11 for juror misconduct. Defense counsel argued it was inappropriate to remove Juror 11 because the juror indicated he was following the court's instructions and believed there was reasonable doubt. She urged that Juror 11 "wanted to delve deeper into the analysis, and not just quickly make a decision" but this did not mean Juror 11 would not follow the

15

law. She argued Juror 11 had not considered information outside the evidence in deliberations, he merely considered the lack of evidence. In sum, defense counsel argued that Juror 11 had done nothing inappropriate; this was simply a case where a majority of jurors believe one thing, and Juror 11 believes something different.

In response, the trial court clarified that he was also taking into account the statement of Juror 11 himself, including "the way he answered the Court's questions, the times he paused, as well as his statement to what I believe is one of the most critical questions, when I had asked him specifically if he had ever used the phrase, if he were to strictly follow the law, he would find the defendant guilty, his response was, he did not recall. Whereas the other two jurors specifically recalled that [Juror 11] had used that phrase."

The trial court removed Juror 11 from the jury, concluding "I do not find that this juror has refused to deliberate; but I find the juror has considered information outside of the evidence that was received into trial. I find the juror has also . . . applied different and incorrect standards of the burden that the People must meet, and I find the juror has failed to follow the law, failed to follow the instructions as given . . . by the court." The trial court also found Juror 11 considered "the concept of punishment with various phrases he has used. For example, the more serious the charge, or the consequence, the higher standard." The court found the foreperson and Juror 10 more credible than Juror 11 regarding what happened and what was said in the jury room.

An Alternate Juror Is Seated

An alternate was seated in place of Juror 11. The next day, the foreperson wrote another note, indicating that the jury had reached unanimous verdicts on counts 2 through 5, but could not reach consensus on count 1, the murder charge, and that no further discussion or deliberation or anything would be of assistance. After discussion with counsel, the trial court took all of the verdicts which included true findings on all of the enhancements, and declared a mistrial on count 1. All that remained was a brief bifurcated trial on the prior conviction alleged in count 5, for which the jury returned a true finding.

16

Sentence

The district attorney indicated that it did not intend to retry count 1, the murder charge. Defendant was subsequently sentenced to 15 years to life in prison.

## DISCUSSION

Standard of Review

Penal Code section 1089 gives a trial court authority to discharge a juror, " 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, *or upon other good cause shown to the court is found to be unable to perform his duty . . . .*' " A juror who "refuses to follow the court's instructions is 'unable to perform his duty' within the meaning of Penal Code section 1089." (*People v. Williams* (2001) 25 Cal.4th 441, 448.)

We review a trial court ruling discharging a juror for abuse of discretion, but our Supreme Court has made clear that this review "involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair try by an unbiased jury.' [Citations.] Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' [Citations.]" (*Armstrong, supra,* 1 Cal.5th at p. 450.)

Under the demonstrable reality standard, we must do more " 'than simply determining whether any substantial evidence in the record supports the trial court's decision.' (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that

17

the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' [Citation.]" (*Armstrong, supra,* 1 Cal.5th at pp. 450-451.)

"Determining whether to discharge a juror because of the juror's conduct during deliberations is a delicate matter . . . ."[2] (*People v. Cleveland* (2001) 25 Cal.4th 466, 484 (*Cleveland*).) In *Cleveland*, a jury sent a note to the trial court that a particular juror " 'does not show a willingness to apply the law.' " " 'One juror does not agree with the charge and does not show a willingness to apply the law. One juror will not abide the facts and apply the law.' " (*Id*. at p. 470.) The trial court questioned every juror individually and concluded the juror in question was " 'not functionally deliberating,' because he refused to respond to 'specific questions as to elements and facts' and, instead, relied upon 'generalities,' " and discharged the juror. (*Id*. at p. 486.) Our Supreme Court, however, concluded the juror's inability to perform did not appear as a " 'demonstrable reality' " (*id*. at p. 484), and thus Cleveland's right to a unanimous jury was violated. (*Id*. pp. 473-474; see also *id*. at p. 488 (conc. opn. of Werdegar, J.).) The court explained that "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . does not constitute a refusal to deliberate and is not a ground for discharge." (*Id*. at p. 485.)

In *People v. Engelman* (2002) 28 Cal.4th 436 (*Engelman*), the Supreme Court recognized that the judicial task of determining whether a deliberating juror should be

---

[2] The inquiry should be "as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations," and should focus on the jurors' conduct, rather than on content. (*Cleveland, supra,* 25 Cal.4th at p. 485.) The inquiry should "cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or other committed misconduct, and that no other proper ground for discharge exists." (*Ibid*.)

discharged is complicated by the fact that it is "even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or intentionally disregarding the law. Jurors, of course, do not always know what constitutes misconduct." (*Id*. at p. 446.) A juror cannot be discharged for "failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view (see *Cleveland, supra,* 25 Cal.4th at pp. 481-484), but laypersons may not understand this. It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so. As we have stated, it is not required that jurors deliberate well or skillfully." (*Engelman, supra,* 28 Cal.4th at p. 446.)

*Engelman*, too, reiterated that courts "must exercise care in responding to an allegation from a deliberating jury that one of their number is refusing to follow the court's instructions." (*Engelman, supra,* 28 Cal.4th at p. 445.) The court observed, "[E]ven though refusal to follow the court's instructions on the law constitutes misconduct, a court's inquiry regarding a juror's motivations could 'compromise[e] the secrecy of the jury's deliberations,' and "warned of the risk inherent in 'permit[ting] trial judges 'to conduct intrusive inquiries into . . . the reasoning behind a juror's view of the case, or the particulars of a juror's (likely imperfect) understanding or interpretation of the law as stated by the judge.' " (*Id.* at p. 445, quoting *People v. Williams, supra,* 25 Cal.4th at p. 464 (conc. opn. of Kennard, J.).

Analysis

Defendant contends the trial court abused its discretion in removing Juror 11 from the jury. We agree.

*Consideration of Evidence Outside the Trial*

The trial court concluded that Juror 11 considered evidence that was not before the jury. The trial court never identified this extra-record evidence or information, and we cannot find any. The Attorney General apparently considers the extra-record evidence to

be the foreperson's and Juror 10's allusions to "new scenarios" and the "behavior of the vehicles on the road." This is not persuasive. While it is true that the trial court's inquiries into the deliberations revealed that Juror 11 was considering whether the driver of the Dodge Charger used a turn signal,[3] this was an issue in the case. The driver testified that it was his habit to use turn signals, and he did so all the time. But the expert testified that the EDR for the Dodge Charger did not indicate one way or the other whether the turn signal was on before the vehicle turned into the driveway of the Merriam Winery. And whether the blinker was on or off was argued by both counsel in closing.[4]

Because the presence or absence of evidence about the blinker was an issue in the case, deliberating as to its significance was not a basis to discharge Juror 11. When Juror 11 was asked whether he was "considering other information or other evidence aside from the evidence" received in trial, he answered no. There was no substantial evidence in the record to show otherwise.

*Consideration of Punishment*

Another reason the trial court gave for Juror 11's discharge was that he "considered . . . the concept of punishment" in his deliberations. This is not borne out in the record by substantial evidence.

---

[3] Recall that Juror 10 said that Juror 11 said that "because there was no evidence of a blinker or indicator, that he felt that that was evidence in itself . . . ." And the foreperson also stated that Juror 11 "continued to insist that because we didn't have blinker information on the [EDR's], that the [EDR's] were not complete." Juror 11 agreed that he raised the issue of whether there was evidence that the blinker was on or off.

[4] The prosecutor argued in closing that the driver of the Dodge Charger "always uses his signal. Now we don't have any confirmation that he used the signal, 'cause we don't have that on the [EDR], and nobody was able to testify whether they saw it or not. Okay? But why would he lie?" Defense counsel responded that there was "no evidence" the driver of the Dodge Charger turned on his blinker. In rebuttal, the prosecutor brought up the issue again, arguing the driver was "credible. And he always uses his turn signal."

20

Juror 10 unequivocally confirmed that *no* juror said they were considering punishment in the case.

The foreperson had a different take. He said Juror 11 and others "brought it up" and it "may have been mentioned once or twice," but whenever it came up, "the group would very quickly remind everyone" that punishment was not part of the jury's role. The foreperson did not convey that these were anything more than passing references, immediately batted down by the rest of the jurors.

Juror 11 answered "unfortunately yes" to the trial court's question about whether any juror had said they were considering punishment. He then elaborated, without prompting, that punishment was the court's responsibility, not the jury's, and expressed his discomfort with the fact that the jury's discussion included punishment. But he stated twice, and unequivocally in response to the trial court's repeated question, that he had not considered or discussed the defendant's possible punishment.

The record reflects no evidence to support the trial court's view that Juror 11 was "absolutely inconsistent with the fellow jurors." Juror 10 and the foreperson flatly disagreed with one another whether punishment had even been discussed. Juror 11 and the foreperson agreed that the issue had come up, but that it had been batted down. Juror 11 denied he had raised or considered the issue, and gave the fullest disquisition that punishment was not in the jury's purview. Even if Juror 11 had brought up the issue of punishment, there is insufficient evidence that any consideration of it by him was any more than de minimis, and not a basis to discharge him for misconduct. (See *Armstrong*, *supra*, 1 Cal.5th at p. 452 ["de minimis references" to reading a book or looking at a cell phone during deliberation insufficient to conclude juror was refusing to deliberate].)

*Failure to Follow Instructions/Burden of Proof*

The trial court concluded Juror 11 committed misconduct by failing to follow the court's instructions, specifically the burden of proof. The trial court focused on a phrase that Juror 10 and the foreperson attributed to Juror 11, most particularly whether Juror 11 would "strictly follow the law." Juror 11 did not recall using that phrase.

21

When we review the record as a whole, the decision whether to discharge Juror 11 for failing to follow the court's instructions requires more nuance than deciding whether Juror 11 did or did not use, or did or did not recall, a particular phrase. Rather, the question is does the record show as a demonstrable reality that Juror 11 failed to follow the court's instructions? Or is this simply a case of a deadlocked jury where the juror in the minority was grappling with the evidence but may have had difficulty explaining himself?

This was a divided jury in the midst of deliberating on whether the prosecution had proven the two most significant charges, murder and vehicular manslaughter, beyond a reasonable doubt. The trial court knew the jury was deadlocked 10-2 on the murder count and 11-1 on the manslaughter count, and on at least one enhancement, and the inquiry into potential juror misconduct was precipitated by the foreperson's concern that the jury could not reach a verdict. When the foreperson first expounded on his "Personal Note" to the trial court written at 11:45 a.m. on April 3, he told the trial court that there had actually been "a *very solid good faith amount of effort* by all members on the jury" and that he "*commend[ed]* all the members of the jury, because it has been a very invested and involved process by all of them." (Emphasis added.) The trial court correctly recognized when it discharged Juror 11 that the juror was not being excused for failure to deliberate. How could he be? The jury had reached verdicts on two of the counts, and one of the enhancements, and the foreperson emphasized Juror 11's good faith efforts.

Looking at the entire record, it shows two jurors (the foreperson and Juror 10) describing their frustrations after a lengthy trial and deliberation, and ascribing their inability to reach a verdict to Juror 11's failure to follow the court's instructions. The foreperson, who clearly did not share Juror 11's view of the facts, complained that he believed Juror 11 was "trying very hard to justify a position he wants to take" that simply was not "supported by the facts." But does any juror who disagrees with another juror think the other juror's position is supported by the facts? Juror 11, on the other hand, offered his perhaps inartful explanations of why he believed he was following the trial

22

court's instructions and holding the prosecution to its burden of proof. The foreperson reported that Juror 11 never said he would not follow the court's instruction. The foreperson's concern was that Juror 11 was "having a very hard time explaining where their reasonable doubt is coming from and pointing to facts that are giving them reasonable doubt." Juror 10 reported that Juror 11 had said "if he were to strictly follow the law, he would convict . . . ." But in explaining the context of the remark, Juror 10 also stated "it was in reference to trying to explain [Juror 11's] reasoning behind why he was, where his reasonable doubt came from."

At bottom, it appears that Juror 11 "fail[ed] to agree with the majority of other jurors [and] persist[ed] in expressing doubts about the sufficiency of the evidence in support of the majority view" and had trouble "articulat[ing] the exact basis for disagreement after a complicated trial," but these circumstances do not amount to juror misconduct. (*Engelman*, *supra,* 28 Cal.4th at p. 446.) As we have described, it is not a ground to discharge a juror because he "relies on faulty logic or analysis" (*Cleveland, supra,* 25 Cal.4th at p. 485), or because he "does not deliberate well or skillfully" (*Engelman, supra,* 28 Cal.4th at p. 446). The foreperson and Juror 10 (whom the trial court believed over Juror 11) did not claim that Juror 11 said he intended to disregard the trial court's instructions or he disagreed with the law as instructed by the trial court.

The Attorney General claims that Juror 11's statements "resemble" those used by a defense attorney in *People v. Williams, supra,* 25 Cal.4th 441. We are not persuaded. In *Williams*, the defendant was charged with multiple crimes, including unlawful sexual intercourse with a minor as lesser included offenses to the charges of rape. Defense counsel argued in closing about the misdemeanor "statutory rape" charges: "Law as you know is not uniformly applied. . . . Mores, custom[s] change. Times change. And the law must be applied fairly. So if the law is not being applied fairly, that's why you need fair jurors." (*Id.* at p. 445.) Defense counsel then purported to quote from a U.S. Supreme Court case (but actually quoting the dissent) that " ' "a jury may, at times, afford a higher justice by refusing to enforce harsh laws." Please understand.' " (*Id.* at p. 446.) On the first day of deliberation, the foreperson sent a message to the trial court that

23

a juror refused to adhere to the trial court's instruction on statutory rape because he believed the law is "wrong." The juror in question then told the trial court that he was not willing to follow the judge's instruction on this charge because he did not believe statutory rape should be a crime (although he would follow the other instructions for the rest of the charges) and that he was not willing to follow his oath as a juror. Not surprisingly, this juror was discharged. In affirming the judgment, the Supreme Court reaffirmed the "basic rule" that a juror must determine facts and render a verdict in accordance with the trial court's instructions, and failure to do so constitutes failure to perform one's duty as a juror under Penal Code section 1089. (*Id*. at p. 463.) But *Williams* is not this case. Juror 11 said he was following and would follow the trial court's instructions. He did not express a view that any of the charges against defendant here should not be a crime, and there was not substantial evidence in this record to suggest otherwise.

The Attorney General also relies on *People v. Harrison* (2013) 213 Cal.App.4th 1373, 1382, where the Court of Appeal affirmed a decision to remove a holdout juror where the facts demonstrated the juror was unable to follow the law. That case, too, is distinguishable on its facts. There, on a "well supported" record, the Court of Appeal agreed that the juror "manifestly was unable to focus on the relevant principles and to apply the court's instructions to the facts of the case before him" (*id*. at p. 1383), despite accommodations and assistance by the trial court, including permitting the juror nine hours of independent study alone in the jury room to review the jury instructions and notes. (*Id*. at p. 1379.) The juror in question was "overwhelmed by the task of a juror, questioning the basic principles he was instructed to accept, such as the presumption of innocence, and the meaning of many commonly used words in the court's instructions." (*Id*. at p. 1383.) Days into the deliberations, the juror's own five-page set of questions to the trial court with extraneous and irrelevant inquiries about the nature of the legal process and decision making showed his own "deep uncertainties and inability to follow the court's instructions." (*Id*. at p. 1383.)

In sum, we conclude that the trial court's decision to discharge Juror 11 for the reasons stated was not manifestly supported by the evidence on which it relied, and that the trial court abused its discretion in discharging him. (*Armstrong*, *supra*, 1 Cal.5th at p. 451.)

## DISPOSITION

The trial court abused its discretion in discharging Juror 11. This error is prejudicial and requires us to reverse the judgment. (*Cleveland*, *supra*, 25 Cal.4th at p. 486.) The double jeopardy clauses of the California and federal Constitutions do not bar retrial of the case. (*Armstrong*, *supra*, 1 Cal.5th at p. 460.)

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Stewart, J.


A152729, *People v. Salinas-Jacobo*

26

Trial Court:  Superior Court of Sonoma County


Trial Judge:  Hon. Patrick Broderick


Law Offices of John F. Schuck, John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant


Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Elizabeth W. Hereford, Deputy Attorneys General, for Plaintiff and Respondent


A152729, *People v. Salinas-Jacobo*